### The United States *vs.* Isaac Morris.

Indictment under the second and third sections of the act of Congress, entitled, "An Act to prohibit the carrying on the Slave-trade, from the United States to any foreign Place or Country;" passed 10th May, 1800.

The schooner Butterfly, carrying the flag of the United States, and documented as a vessel of the United States, and having the usual equipments of vessels engaged in the slave-trade, sailed from Havana towards the coast of Africa, on the 27th July, 1839. She was captured by a British brig of war, and sent into Sierra Leone, on suspicion of being Spanish property. At the time of the capture, Isaac Morris was in command of the vessel, and was described in the ship's papers, and described himself, as a citizen of the United States. The vessel was sent, by the British authorities at Sierra Leone, to be dealt with by the authorities of the United States. Held, that to constitute the offence denounced, in the second section of the act of 10th May, 1800, it was not necessary that there should have been an actual transportation or carrying of slaves in the vessel of the United States, in which the party indicted served. 2. The voluntary service of an American citizen on board a vessel of the United States, in a voyage commenced with intent that the vessel should be employed in the slave-trade, from one foreign place to another, is an offence against the second section of the law, although no slaves had been transported in such vessel, or received on board of her. 3. To constitute the offence under the third section of the act, it was not necessary that there should be an actual transportation of slaves in a foreign vessel, on board of which the party indicted served. 4. The voluntary service of an American citizen on board a foreign vessel, in a voyage commenced with intent that the vessel should be employed and made use of in the transportation of slaves, from one foreign country to another, is in itself, and where no slaves have been transported in such vessel, or received on board of her, an offence under the third section of the act.

In expounding a penal statute, the Court, certainly, will not extend it beyond the plain meaning of its words; for it has been long and well settled that such statutes must be construed strictly. Yet the evident intention of the legislature ought not to be defeated by a forced and over strict construction.

ON a certificate of division from the Circuit Court of the United States for the Southern District of New York.

The defendant, Isaac Morris, was indicted under the second and third sections of the act entitled "An Act in addition to an Act entitled 'An Act to prohibit the carrying on the Slave-trade from the United States to any foreign Place or Country,' " approved on the 10th of May, 1800.

The first count of the indictment charges that the defendant did, on the high seas, from the 15th day of June, until the 26th day of August, in the year 1839, voluntarily serve on board of the schooner Butterfly, a vessel of the United States; employed and made use of in the transportation of slaves from some foreign country or place to some other foreign country or place: the said defendant being a citizen of the United States.

The second count charges, that the defendant did, on the high seas, from the 15th day of June to the 26th day of August, voluntarily serve on board of the schooner Butterfly, being a foreign vessel employed in the slave-trade: the defendant being a citizen of the United States.

[The United States *vs.* Morris.]

It was proved, on the trial, on the part of the prosecution, that the schooner Butterfly, carrying the flag of the United States, and documented as a vessel of the United States, (her register being dated the 24th day of May, 1839, and issued by the collector of New Orleans to Nathan Farnsworth, a citizen of the United States, as owner,) was boarded and examined, on the 26th day of August, 1839, on the high seas, in latitude 5° 25' north, longitude 30° east, near Cape St. Paul's, on the coast of Africa, by the British brig of war Dolphin, on suspicion of being a Spanish vessel engaged in the slave-trade, in contravention of the treaty between Great Britain and Spain for the suppression of the slave-trade. That on such examination, the vessel was found to be on her voyage from Havana, in the island of Cuba, which port she had left on the 27th day of July, 1839, bound to St. Thomas, in the island of Principe, near the coast of Africa; that the vessel had on board twenty-four large leagers capable of containing each from two hundred and fifty to three hundred gallons of water; eighteen of these were in shocks, that is, the staves were in bundle not fitted; four of them contained water, and two contained bread; there was a quantity of plank stowed away in the hold, similar to the planks used in framing slave-decks, but this plank could not have been fitted as a slave-deck until the vessel had discharged her cargo; and that such leagers and slave-decks were commonly found to be a part of the equipments and fittings of vessels engaged in the slave-trade on the coast of Africa; that she had on board a full cargo, consisting of various commodities, adapted either to the traffic in negroes, or to any lawful trade carried on by trading vessels upon the coast of Africa; that the prisoner was in command of the vessel; that he was described in the ship's papers, and represented himself as a citizen of the United States; that the rest of the ship's company were represented in the crew-list as Spaniards, or Portuguese, who had been shipped at Havana; that there were also on board fourteen Spaniards who had been received at Havana as passengers; that the cargo had been shipped at the same place, and according to the invoice and bill of lading was to have been delivered at St. Thomas, in the island of Principe, aforesaid, and appeared, by the documents, to be owned by persons residing at Havana; that two log-books, one in English and the other in Spanish, were found on board; that various documents in the Spanish language were also found on board; that under these circumstances, the vessel was captured by the Dolphin, suspecting the same to be Spanish property, and sent for adjudication to Sierra Leone to be proceeded against in the Mixed Commission Court at that place, which Court declined taking cognisance of the case on account of the vessel being documented as an American vessel; that she was then sent to the port of New York, to be dealt with by the authorities of the United States as they might think proper.

No slaves were found on board the vessel at the time of her capture; and it was testified by the witnesses for the prosecution, that from the cargo and situation in which the vessel was found, no

slaves could have been carried or transported in her at any time during the voyage on which she was then engaged: that it would have been necessary to have discharged the cargo before slaves could have been taken on board: that the vessel was short of water, having only about eleven gallons on board when she was captured: and that Cape St. Paul's is a common watering place on that coast, being about five hundred miles distant from the island of Principe.

Upon the foregoing state of facts, the judges were divided in opinion upon the four following questions; which were presented on the facts aforesaid for their decision:

1st. Whether it is necessary, in order to constitute the offence denounced in the second section of the act of the 10th of May, 1800, above referred to, that there should be an actual transportation or carrying of slaves in the vessel of the United States on board of which the party indicted is alleged to have served.

2d. Whether it is necessary, in order to constitute the offence denounced in the third section of the act of the 10th of May, 1800, above referred to, that there should be an actual transportation or carrying of slaves in a foreign vessel, on board of which the party indicted is alleged to have served.

3d. Whether the voluntary service of an American citizen on board a vessel of the United States, on a voyage commenced with the intent that the vessel should be employed and made use of in the transporting or carrying of slaves from one foreign country or place to another, is in itself, and where no slaves had been transported in such vessel, or received on board her, an offence under the said second section.

4th. Whether the voluntary service of an American citizen, on board a foreign vessel, on a voyage commenced with the intent that the vessel should be employed and made use of in the transportation and carrying of slaves, from one foreign country or place to another, is in itself, and where no slaves had been transported in such vessel, or received on board her, an offence under the said third section.

Which points were stated under the direction of the Court, at the request of the counsel for the parties in the cause, and ordered to be certified into the Supreme Court of the United States, pursuant to the act in such cases made and provided.

The case was argued by Mr. Gilpin, Attorney General of the United States, for the plaintiffs; and by Mr. Nelson, for the defendant. Mr. Philip Hamilton submitted a written argument for the defendant.

Mr. Gilpin, for the United States.

The questions that present themselves in this case are these:

1. Whether the voluntary service on board of an American vessel, on a voyage commenced with the intent that she shall be employed in the transportation and carrying of slaves, is a violation of the second section of the act of 10th May, 1800, (1 Story's Laws, 780,) without any slaves being actually transported or carried.

2. Whether the voluntary service on board of a foreign vessel, on a voyage commenced with the intent that she shall be employed in the slave-trade, is a violation of the third section of the same act, without any slaves being actually transported or carried.

In the construction of a statute, the first inquiry is, what was the intention of the legislature? The second, whether that intention is so clearly expressed as to embrace within its prohibition the acts complained of.

I. The whole scope of the enactments of Congress shows their intention to punish every American citizen who engages in the slave-trade.   As early as 1794, they passed an act " to prohibit carrying on the slave-trade." 1 Story's Laws, 319.   This was followed, in 1800, by an additional act for the same purpose.   1 Story's Laws, 780.   In 1807, and in 1818, acts were passed, " to prohibit the importation of slaves into the United States."   2 Story's Laws, 1050. 3 Story's Laws, 1698.   In 1819, additional prohibitions against " the slave-trade" were adopted.   3 Story's Laws, 1752.   And, finally, in 1830, it was declared to be piracy. 3 Story's Laws, 1798. This series of acts evinces the evident intention of Congress to prevent the slave-trade, the traffic; whether to the United States, or to foreign countries.

When we examine the particular provisions of these various laws, the same intention is yet more apparent.   The fitting out of vessels for the trade, their sailing outward, their employment in the actual traffic, their bringing slaves to the United States, or taking them to foreign ports, are all matters of minute regulation.  No citizen can fit out or equip a vessel for the slave-trade, either in any part of the United States, or in any other place, to sail from the United States; nor can he hold any property, directly or indirectly, in a vessel engaged in transporting slaves between two foreign countries; nor can a vessel sail from the United States to engage in such traffic; and if she clears out for the coast of Africa, security against her engaging in such traffic may be required, and must be given. 1 Story's Laws, 319. 780.   3 Story's Laws, 1698.   These are provisions to guard against, prevent, and punish the preparatory or previous steps connected with this traffic.   Again, the President is to cause an armed vessel to cruise on the African coast, and to bring into our ports all American vessels intended to transport slaves; severe penalties are provided against any citizens who shall there take slaves on board, or transport them to a foreign country, or to the United States; or be found with any so brought for the purposes of sale, in any of our ports or bays; or hold, sell, or dispose of them. 1 Story's Laws, 319.   2 Story's Laws, 886. 1050.   3 Story's Laws, 1698. 1752.   Here, then, is a series of enactments, providing against every contingency in which American citizens can be connected with this traffic, except their service in American or foreign vessels, during the outward voyage.   Is it possible that Congress could omit to provide for this also?   Yet such is the fact, unless they have done so by the second and third sections of the act of 10th May,

1800. 1 Story's Laws, 780. It is a well established rule, that the cause producing a law, and the general object to be attained, are to be considered in construing it. Preston vs. Browder, 1 Wheat. 124. If this rule be applied, the inference is irresistible that the legislature intended by these sections to include that portion of the traffic which is not elsewhere provided for; that they intended the voluntary participation of our citizens in it should be punished, independently or equally with other conduct connected with such participation.

II. Is this intention so expressed in the act, as to subject an offender to its penalties? Is he adequately warned by its language of the nature of the offence? No doubt is expressed as to the clearness with which the intention of Congress is made known on all points but one. The person, the service, the vessel, are clearly designated. But "the voyage," which it was intended to prohibit, is supposed to be doubtful. It is alleged, that "employment in the transportation and carrying of slaves," cannot refer to the outward voyage; but relates exclusively to one during which the vessel has slaves actually on board. Is this the import of the words?" Are they not a general designation of the prohibited traffic? Do they not signify the business in which the vessel is employed? Coaches are engaged "in the transportation of passengers:" surely, the occasional want of a passenger does not change the character or description of their employment. Carriers are engaged in the transportation of merchandise, though their vehicles may be sometimes empty. Vessels are engaged in the fisheries, though a voyage of thousands of miles is necessary before they reach the place where they are actually employed in fishing. Carriers of the mail are properly so designated, though no mail be at a particular moment in their charge. Persons are employed in the post-office, though not performing at every instant the duties annexed to their office. Tonnage duties are payable by vessels "employed in he transportation of goods coastwise," at every entry, though they may be occasionally without a cargo. This construction is sanctioned by numerous acts of Congress, relating to navigation, the fisheries, and the post-office establishment. 1 Story's Laws, 5. 208. 2 Story's Laws, 1353. 3 Story's Laws, 1986. 4 Story's Laws, 2256.

But this signification is made more obvious by an examination of the particular statutes on this subject. The act of 1794 is entitled, "to prohibit carrying on the slave-trade," (1 Story's Laws, 319;) yet it provides against the "fitting out" of vessels in our ports. How is this "carrying on the slave-trade," unless all parts of the general design are included in that phrase? So the act of 3d March, 1819, (3 Story's Laws, 1752,) was passed "to prohibit the slave-trade;" yet it subjects vessels "intended for the purpose of carrying slaves," to forfeiture. So the act of 10th May, 1800; (1 Story's Laws, 780,) upon the construction of which the present case turns, and which provides both for the punishment of persons, and the forfeiture of vessels; condemns a vessel for being engaged in the

business of the slave-trade. Can it be contended that the outward voyage of a vessel fitted out for the slave-trade, is not included in that language; and, if so, is it possible to exclude from the punishment prescribed by the act, a person voluntarily and knowingly serving on board the vessel, when its object was evidently to reach the one as well as the other? Again, the third section punishes a citizen of the United States who voluntarily serves on board of a foreign vessel engaged in the slave-trade; the second section punishes a citizen of the United States who voluntarily serves on board of an American vessel engaged in transportation and carrying of slaves. Could Congress intend to make the same act of a citizen of the United States more or less criminal in the one case than in the other? Yet so it must do, if a different meaning is to be given to the language used in the two sections.

The construction contended for is also sanctioned by judicial decisions. The case of the Alexander, 3 Mason, 175, was an indictment for holding a right of property in a vessel "employed in the transportation and carrying of slaves." The vessel was prepared for that purpose, but had taken no slaves on board; yet the defendant was convicted. In the case of the Fortuna, 1 Dodson, 81, the outward voyage was held to be a violation of the slave-trade acts. In the case of the Donna Marianna, 1 Dodson, 91, Sir William Scott condemned a vessel on the outward voyage, and not having taken any slaves on board, under the act of 23d May, 1806, (23 Raithby's Stat. at Large, 326,) although the words of that act only embrace a vessel in which slaves "shall be exported, transported, carried," &c. These are direct judicial decisions on the point in question. The same principle of interpretation may be recognised in other cases. The Emily and Caroline, 9 Wheat. 381, was a libel under the act of 22d March, 1794, which condemns a vessel if she shall be fitted out for the slave-trade. Her fitting out was but just begun, yet it was held sufficient. In the Merino, 9 Wheat. 391, two points are established: that the act of 10th May, 1800, was meant to prevent any citizen of the United States from participating in or affording facilities for the slave-trade; and that this general intent was to be regarded in its construction. The Plattsburgh, 10 Wheat. 133, was condemned for being fitted out, under the act of 22d March, 1794, though the equipment was only commenced. In the United States *vs.* Gooding, 12 Wheat. 460, the vessel sailed from Baltimore without any fitments, they being sent in another vessel to St. Thomas, where she was to put them on board; yet this was held to be a fitting out at Baltimore. In the United States *vs.* Quincy, 6 Peters, 464, an indictment for fitting out a vessel, with intent to employ her in committing hostilities, was sustained, although the fitments were admitted to be insufficient.

The result is, that where the general intent of a statute is to prevent certain acts, the subordinate proceedings, necessarily connected with them and coming within that intent, are embraced in its provisions. It is true, that in penal laws a more rigid rule of construc-

tion prevails than in relation to other statutes; but that rule does not authorize or contemplate a merely literal interpretation, at the expense of an evident intent, so expressed as to be well known to a person violating it. 5 Wheat. 76. 95. 2 Mason, 144. Paine, 209. The act forbidden to be done was, voluntarily serving in this voyage, which was a voyage for the purpose of transporting slaves; whether or not that purpose was fully effected is immaterial, if it has been proved to the satisfaction of the jury that such was in fact the purpose of the voyage then in progress; and that the participation of the defendant in it was voluntary on his part, with a knowledge of that purpose.

Mr. Philip Hamilton, for the defendant, submitted the following written argument:

Though four points are presented on the record, there are substantially but two, viz. the first and fourth. These decided, dispose of the others.

1. To sustain the prosecution, the case of the Alexander, 3 Mason, is chiefly relied on. The analogy, though ingenious, does not seem just; as between a fostered trade and a pursuit denounced by a penal statute, to interpret that statute.

The language used by Congress in reference to the fisheries should not be adopted in reference to the slave-trade; as the act in relation to the former speaks of "carrying on fisheries;" "employed in the fisheries;" "a fishing voyage;" without defining any acts that shall constitute the pursuit or employment: it is otherwise in regard to the slave-trade. See acts of Congress of 18th February, 1793, (1 Story's Laws U. S. 285;) act of June 19th, 1813, sec. 1, 2, (2 Story's Laws, 1315.)

2. It is improbable that the act of 1800, section third, aimed to reach intent; as the intent could not have been manifested in any other manner than by the precise acts inhibited by the second section, viz. the carrying, &c.

The honest and the guilty trade would have been precisely similar to a certain point. Both vessels would go to the coast. Both would be similarly equipped. Both would there take slaves on board.

The next movement indicates the intent, and is the very carrying trade denounced by the second section. It would be a strange anomaly to legislate in regard to intent, after having legislated in regard to the particular fact, when the intent could only be established by the consummation of the act forbidden.

Contemporaneous circumstances and interests repel the idea that intent was aimed at, as the friends of the trade would never jeopard it by exposing the lawful trader to be captured on her outward voyage, in order to discover, from the vessel, evidence that she intended to prosecute an unlawful trade.

3. If Congress aimed at intent, it would have been so expressed in the act. No acts were ever more deliberated on, or more artifi-

cially prepared than the early slave acts. . The friends of the trade watched the legislation with too much jealousy, not to detect that lurking object if it had existed.    Refer to all the acts, and it will be found that wherever intent has been aimed at, it has been distinctly expressed.    1st, 2d, and 3d sec. of the act of March, 1794, (1 Story's Laws U. S. 319 ;) 2d and 3d sec. of the act of 20th April, 1818, (3 Story's Laws U. S. 1698.)

4. If the prosecutor can claim that intent was involved in the third section of the act of 1800, why may he not say it was also the subject of the fourth section of the act of May 15th, 1820 ? both acts using synonymous expressions—the act of 1800, "employed in the slave-trade;" act of 1820, "carrying on the slave-trade."

So the third section of the same act subjects the offenders to capital punishment, who, " engaged in a piratical cruise or enterprise," shall land and commit robbery.    The expressions are as general as " carrying on fisheries ;"  " a fishing voyage:"  yet, could a man be guilty of the capital offence who was on board of a vessel designed for " carrying on the slave-trade," who did not decoy, or land and forcibly seize slaves; or who was " engaged in a piratical cruise or enterprise," and did not land and commit robbery?

In this prosecution, the United States seek, by blending the second and third sections of the act of 1800, to sustain the construction that intent was aimed at.    With the same propriety they might contend, that the moment this vessel sailed from her home port she was guilty of piracy, under the act of 1820, because she might have been designed for the purposes therein specified.

This expanding and enlarging of statutes by construction; this adaptation of statutes to the varying facts and circumstances of each case, rather than applying the varying facts to the immutable statute, is wholly inadmissible ; especially so in criminal jurisprudence.

5. In the case of the Alexander, the learned judge interprets the first and second sections by the third and fourth, and thinks Congress intended the same thing.    Admitting that to a certain extent they mean the same, we still contend that the third and fourth sections are to be interpreted by the first and second.    The meaning of the second section we get from the act itself, viz. the actual carrying of slaves.    Section first (1800) gives double the value of slaves which may have been transported or carried.    Section fourth forfeits all, but the slaves which may have been found on board : also, precludes the right to claim slaves found on board.    The language of the second section so clearly and explicitly expresses the offence intended to be denounced, that every man who reads must understand what is forbidden :  hence there is no room for construction ; and the language must be taken in its natural sense and ordinary signification and import. . 1 Kent's Com. 462.    The words of a statute are to be taken in their natural sense, and ordinary signification and import.

In the United States vs. Wilberger, 5 Wheat. 96, it is held : Where

there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed to justify a Court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest.

That the second section is limited to the actual transportation as we claim for it, will appear from a brief historical view of the slave acts.

The Constitution, article one, section nine, declares, that the migration or importation of such persons, as any of the states now existing (1789) shall think proper to admit, shall not be prohibited by Congress prior to the year 1808. That article secures the import trade for a given period. In 1794, the current of public sentiment became irresistible, and by the act of that date the traffic was cut up so far as measures suggested themselves to the wisdom of Congress, and were consistent with the sacred obligation of that instrument. The cardinal objects of the trade which could be reached, were the export and carrying trade. The subjects in regard to which Congress could legislate, were vessels and persons. They might legislate over the property of citizens and foreigners residing within the United States, as well as over their persons.

By sec. 1 of the act of 1794, vessels of citizens or foreigners fitted out from the United States to be employed in the export or carrying trade, were forfeited. By the second section of that act, they reached the persons of citizens or foreigners in the United States, by a severe penalty, who should fit out the vessels. Thus the subject rested until the year 1800, when it was ascertained that the act of 1794, did not effectually accomplish its object; as ingenuity, sharpened by the hope of gain, soon devised means to evade that law. The carrying trade was found so lucrative, that though vessels might not be fitted out from the United States, still American capital might be embarked in foreign vessels. By sec. 1 of the act of 1800, all right and property directly or indirectly owned in any vessel (American or foreign) employed in the carrying trade, was forfeited. Thus American capital and American vessels being excluded, Congress determining still further to cut up the trade, prohibited American citizens from rendering their personal services to promote it, and did so by the second and third sections of the act of 1800. The act of 1800 was merely auxiliary to the act of 1794; and from a careful examination of both, it will appear, that Congress therein exhausted all their powers of legislation on the subject, embarrassed as it was by the Constitution.

6. It thus appearing that to prevent American citizens from serving on board of American vessels employed in the carrying trade, was an essential link in the system, it is obvious, that the second section is to be expounded precisely as the concise and perspicuous language expresses, and that there is no room for construction. In the third section a different form of expression is adopted. It would

perhaps, be assuming too much to say, that the change was not a change of substance, rather than a loose and inartificial employment of language.

We contend, that the third section means the same thing as the second, and something more. It means the slave-trade in foreign vessels, in all its illegal branches, so declared by Congress. The second section is confined to one portion of it. It could not refer to the slave-trade prohibited by the laws of any other country, for two obvious reasons: 1. Because American citizens are not to be punished by the laws of the United States, for a violation of the municipal laws of any other power. 2. If otherwise, in point of fact, the slave trade was a lawful trade in all its branches throughout the world. until long after this period. In 1807, the first act of the Parliament of England was passed on this subject.

If this proposition be correct, then the slave-trade punished by the third section, was the trade prohibited by Congress, viz.: the carrying trade and the export trade on board of foreign vessels; to embrace these two branches, the general expression, "slave-trade," was peculiarly appropriate. Whatever might have been the object of Congress, it is evident, by collating the acts and the sections of each, that the construction claimed for it by the prosecution cannot be sustained.

7. In addition to these considerations, the defect of wisdom should not be attributed to Congress of passing a law that must inevitably result in the consummation of a wicked purpose. Once embarked in the pursuit, it is more dangerous to recede than to advance; when to go forward presents the alluring prospects of gain, with the same, and, perhaps, greater chances of impunity.

Mr. Nelson, for the defendant, stated that he would only ask the attention of the Court to the acts of Congress.

The act of 1794, was intended to embrace two descriptions of cases. First, transporting of slaves from a foreign country to the United States. Second, transporting slaves to foreign countries. It also applies to fitting out vessels to carry on the slave-trade. This was the condition of the law when the act of 1800 was passed; and the object of that act was to make the penalties of the former act applicable to vessels not built in the United States.

The purpose of this prosecution is not to forfeit the vessel, but to punish persons serving on board of a vessel engaged in the slave-trade. The employment of a person on board a vessel engaged in the transportation and carrying of slaves, is a very different thing from the employment of a vessel, or person on board of a vessel, designed to be employed in the slave-trade. Whenever the legislature design to punish intention, they so express it.

Mr. Chief Justice TANEY delivered the opinion of the Court.

This case comes before us upon a certificate of division from the Circuit Court of the United States, for the Southern District of New York, in the second circuit.

2 R 2      60

The defendant, Isaac Morris, is indicted under the second and third sections of the act entitled "An Act in addition to an Act entitled 'An Act to prohibit the carrying on the Slave-trade from the United States to any foreign Place or Country," approved on the 10th of May, 1800.

The first count of the indictment charges that the defendant did, on the high seas, from the 15th of June until the 26th of August, in the year 1839, voluntarily serve on board of the schooner Butterfly, a vessel of the United States, employed and made use of in the transportation of slaves from some foreign country or place, to some other foreign country or place, the said defendant being a citizen of the United States.

The second count charges that the defendant did, on the high seas, from the 15th day of June to the 26th day of August, voluntarily serve on board of the schooner Butterfly, being a foreign vessel employed in the slave-trade; the defendant being a citizen of the United States.

It was proved on the trial, on the part of the prosecution, that the schooner Butterfly, carrying the flag of the United States, and documented as a vessel of the United States, sailed from Havana, for the coast of Africa, on the 27th of July, 1839, having on board the usual and peculiar equipments of vessels engaged in the transportation of slaves from the coast of Africa to other places. Before she reached the African coast, and before any slaves were taken on board, she was captured by the Dolphin, a British brig of war, and carried into Sierra Leone; upon suspicion of being Spanish property, to be proceeded against in the Mixed Commission Court at that place. At the time of her capture, Isaac Morris was in command of the vessel, and was described in the ship's papers and represented himself as a citizen of the United States. The Court at Sierra Leone declined taking cognisance of the case, because the vessel was documented as an American vessel; and she was then sent to New York, to be dealt with by the authorities of the United States, as they might think proper.

Upon the foregoing state of facts, the judges were divided in opinion upon the four following questions, which were presented on the facts aforesaid for their decision:

1. Whether it is necessary in order to constitute the offence denounced in the second section of the act of the 10th of May, 1800, above referred to, that there should be an actual transportation or carrying of slaves in the vessel of the United States, on board of which the party indicted is alleged to have served.

2. Whether it is necessary in order to constitute the offence denounced in the third section of the act of the 10th of May, 1800, above referred to, that there should be an actual transportation or carrying of slaves in a foreign vessel, on board of which the party indicted is alleged to have served.

3. Whether the voluntary service of an American citizen, on

board a vessel of the United States, in a voyage commenced with the intent that the vessel should be employed and made use of in the transporting or carrying of slaves from one foreign country or place to another, is in itself, and where no slaves had been transported in such vessel, or received on board her, an offence under the said second section.

4. Whether the voluntary service of an American citizen, on board a foreign vessel, in a voyage commenced with the intent that the vessel should be employed and made use of in the transportation and carrying of slaves from one foreign country or place to another, is in itself, and where no slaves have been transported in such vessel, or received on board her, an offence under the said third section.

And these points having been certified to this Court, we proceed to express our opinion upon them.

The second section of the act of Congress above mentioned, declares, "that it shall be unlawful for any citizen of the United States, or other person residing therein, to serve on board any vessel of the United States, employed or made use of in the transportation or carrying of slaves from one foreign country or place to another; and any such citizen or other person voluntarily serving as aforesaid, shall be liable to be indicted therefor, and on conviction thereof shall be liable to a fine not exceeding two thousand dollars, and be imprisoned not exceeding two years."

The first and third points certified from the Circuit Court, depend on the construction of this section.

In expounding a penal statute the Court certainly will not extend it beyond the plain meaning of its words; for it has been long and well settled, that such statutes must be construed strictly. Yet the evident intention of the legislature ought not to be defeated by a forced and overstrict construction. 5 Wheat. 95.

The question in this case is, whether a vessel on her outward voyage to the coast of Africa, for the purpose of taking on board a cargo of slaves, is " employed or made use of " in the transportation or carrying of slaves from one foreign country or place to another, before any slaves are received on board?

To be " employed" in any thing, means not only the act of doing it, but also to be engaged to do it; to be under contract or orders to do it. And this is not only the ordinary meaning of the word, but it has frequently been used in that sense in other acts of Congress. Thus, for example, the second section of the act of March 3d, 1825, entitled, " an act to reduce into one, the several acts establishing and regulating the post-office department," declares, " that the Postmaster-general, and all other persons 'employed' in the general post-office, or in the care, custody, or conveyance of the mail, shall, previous to entering upon the duties assigned to them," take the oath prescribed by that section. Here the persons who have contracted to perform certain duties in the general post-office, are described as

" employed" in that department, before they enter upon the duties assigned them. So, also, in the twenty-first section of the same law, various offences, such as the embezzling or destroying any letter, are enumerated, and the punishment prescribed, when committed by any person " employed in any of the departments of the post-office establishment." Yet it cannot be supposed that the party must be actually engaged in transacting his official duties when the letter was embezzled or destroyed, in order to constitute the offence described in this section.

Again, the act of July 2d, 1813, sec. 8, (2 Story, 1353,) declares, that certain vessels "employed" in the fisheries, shall not be entitled to the bounties therein granted, unless the master makes an agreement, in writing or in print, with every fisherman employed therein before he proceeds on any fishing voyage. Here the vessel is spoken of as " employed" in the fisheries, before she sails on the voyage.

So, also, the act of March 3d, 1831, (4 Story, 2256,) entitled, " an act concerning vessels employed in the whale fishery," authorizes vessels owned by any incorporated company, and " employed wholly in the whale fishery," to be registered or enrolled, and licensed in a particular manner, " so long as any such vessel shall be wholly employed in the whale fishery." The register or enrolment and license, must be obtained before the vessel sails on her outward voyage to the whaling grounds; and, consequently, in that voyage she must be " employed" in the whale fishery, in the sense in which these words are used in the act of Congress; otherwise, she would not be entitled to the register or enrolment and license authorized by this law.

In like manner, the vessel in question was employed in the transportation of slaves, within the meaning of the act of Congress of May 10th, 1800, if she was sailing on her outward voyage to the African coast, in order to take them on board, to be transported to another foreign country. In such a voyage, the vessel is employed in the business of transporting and carrying slaves from one foreign country to another. In other words, she is employed in the slave-trade. And any citizen of the United States, who shall voluntarily serve on board any vessel of the United States, on such a voyage, is guilty of the offence mentioned in the second section of this act of Congress. It is hardly necessary to add, that " voluntarily," in this section, means, " with knowledge" of the business in which she is employed. And in order to constitute the offence, the party must have knowledge that the vessel was bound to the coast of Africa, for the purpose of taking slaves on board, to be transported to some other foreign country.

The same reasoning applies to the third section of the law, under which the second and fourth points certified to this Court have arisen. The vessel is " employed in the slave-trade" when sailing to the African coast for the purpose of taking the slaves on board.

We therefore answer the first and second questions in the nega-

tive, and the third and fourth in the affirmative; and it will be certified accordingly to the Circuit Court.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of New York, and on the points and questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this Court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this Court:

1. That it is not necessary, in order to constitute the offence denounced in the second section of the act of the 10th of May, 1800, referred to, that there should be an actual transportation or carrying of slaves in the vessel of the United States, on board of which the party indicted is alleged to have served.

2. That it is not necessary, in order to constitute the offence denounced in the third section of the act of the 10th of May, 1800, above referred to, that there should be an actual transportation or carrying of slaves in a foreign vessel, on board of which the party indicted is alleged to have served.

3. That the voluntary service of an American citizen on board a vessel of the United States, in a voyage commenced with the intent that the vessel should be employed and made use of in the transporting or carrying of slaves from one foreign country or place to another, is in itself, and where no slaves had been transported in such vessel, or received on board her, an offence under the said second section.

4. That the voluntary service of an American citizen on board a foreign vessel, in a voyage commenced with the intent that the vessel should be employed and made use of in the transportation and carrying of slaves from one foreign country or place to another, is in itself, and where no slaves had been transported in such vessel, or received on board her, an offence under the said third section.

Whereupon, it is now here ordered and adjudged that it be so certified to the said Circuit Court accordingly.