UNITED STATES v. BIGGS et al.

(District Court, D. Colorado. December 24, 1907.)

No. 2,028.

1. CONSPIRACY—CONSPIRACY TO DEFRAUD UNITED STATES OF PUBLIC LANDS—INDICTMENT.

A contract by an applicant for entry of public land under Timber & Stone Act June 3, 1878, c. 151, 20 Stat. 89, as amended by Act Aug. 4, 1892, c. 375, § 2, 27 Stat. 348 [U. S. Comp. St. 1901, p. 1547], made after the application, but before the consummation, of the entry, by which the money to pay for the land was to be furnished by another and the title, when acquired, was to be conveyed to such other, is not unlawful under the statute, and the procuring of such contract is not criminal, and cannot be made the basis of an indictment to defraud the United States of such lands, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676].

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 60.]

2. SAME—INDICTMENT—LIMITATION.

An indictment, under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], for conspiracy to defraud the United States, which sets out a number of overt acts on different dates, is either bad for duplicity, as charging more than one conspiracy or, if held to charge a single continuing conspiracy, the offense was consummated when the first overt act was committed, and from that date the statute of limitations began to run.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 81, 97.]

3. SAME—AVERMENT OF OVERT ACT.

Whether an act charged in an indictment for conspiracy as an overt act to effect the object of such conspiracy was such overt act may be determined by the court, where it is clear from the face of the indictment that it could not by any possibility have tended to effect the object of the conspiracy.

## On Demurrer to Indictment and Motion to Quash.

The indictment in this case attempts to charge a conspiracy, and is bottomed upon Rev. St. U. S. § 5440 [U. S. Comp. St. 1901, p. 3676], and the second clause thereof, to wit: "If two or more persons conspire * * * to defraud the United States in any manner, or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy," etc. The indictment charges that the defendants Biggs, Freeman, McPhee, and McGinnity "on the twenty-fifth day of August in the year eighteen hundred and ninety-nine, and at the several times of the committing of the several overt acts hereafter in this indictment mentioned, and continuously at all times between the said twenty-fifth day of August in the year last aforesaid and

the day of the presenting of this indictment, unlawfully, corruptly, wickedly, and maliciously did conspire, combine, confederate, and agree together, and with divers other persons to the grand jurors unknown, indirectly to obtain from the said United States for a certain corporation, to wit, the New Mexico Lumber Company, a large quantity of land, to wit, eleven hundred and seventeen acres of timber lands, in excess of the quantity of such lands which the said corporation could lawfully obtain directly from the United States"; that these lands were subject to entry at the Durango land office under the laws pertaining to the sale of timber lands and under the regulations made in pursuance to law by the Commissioner of the General Land Office. It is then charged that a description of the lands is set forth in that part of the indictment which subsequently charges the commission of overt acts in procuring the execution and verification of certain documents, each entitled "Testimony of Claimant." It is then charged that the lands were to be obtained as aforesaid from the United States for said corporation in the following manner: "By the said defendants soliciting and procuring the persons aforesaid (presumably those theretofore charged as unknown to the grand jurors), for hire and under agreements with them separately to that end, to pay to the receiver of the said land office, with moneys to be furnished to them by the said corporation, the price fixed by law therefor, make entries as individual entrymen at the land office aforesaid with the said receiver of tracts of such lands in quantities, respectively, not exceeding the quantities allowed by the said laws and regulations, secure patents from the said United States for the said lands to themselves as such entrymen, and make conveyances of the title to the said lands to one William Barth, an agent and trustee for the said corporation, and by the said defendants requiring the said William Barth to convey such title to the said corporation." After setting forth eight overt acts done in furtherance of said conspiracy, the indictment then concludes: "And so the grand jurors aforesaid, upon their oath aforesaid, do say that [the defendants, naming them] on the said twenty-fifth day of August in the year eighteen hundred and ninety-nine, and from thence hitherto and at the several times of the committing of the said several overt acts in this indictment charged (the said unlawful, corrupt, wicked, and malicious conspiracy, combination, confederation, and agreement during all the time from the said day when the same was originally entered into, to wit, the said twenty-fifth day of August in the year eighteen hundred and ninety-nine to the date of the presenting of this indictment being still continuing and in existence) in manner and form in this indictment aforesaid, unlawfully, corruptly, wickedly, and maliciously did conspire," etc., indirectly, deceitfully, and fraudulently to obtain from the United States, for the said corporation, certain of the public lands and property of the United States in quantity greatly in excess of the quantity which the said corporation could lawfully obtain directly, and in that manner defraud the United States of its valuable property in such lands, and of its governmental functions in disposing of the same.

The indictment charges overt acts in furtherance of said conspiracy as follows: First, that the defendant Freeman, on the 25th day of August, 1899, unlawfully did, by solicitation and promise of reward to her in some small sum of money, the amount whereof is to the grand jurors unknown, induce and procure one Jennie Culbertson to execute and verify by her oath before the said register a certain document in the form prescribed by law and entitled "Testimony of Claimant," for presentation by the said Jennie Culbertson to the said register, and through the said register to the Commissioner and the said Secretary, in connection with the entry of the said Jennie Culbertson of the timber lands described, containing 160 acres. The second and third overt acts as charged are identical with the first in time, character of affidavit, and amount of lands, and differ only as to name of entryman. The fourth, fifth, sixth, and seventh overt acts charged are identical with the first; except that they all charge the overt acts therein specified to have been done on October 11, 1899. They differ, however, as to the name of entrymen. The eighth overt act as charged is to the effect that the defendants McPhee and McGinnity, on May 15, 1906, unlawfully did request and require said William Barth to sign and execute a certain quitclaim deed conveying the title to all the lands

described in the overt acts to the corporation as grantee. The indictment then sets forth the deed in hæc verba, the closing paragraph of which, in the testimonial clause thereof, is as follows: "This deed is given as correction for deed made June 1, 1900."

The lands described in this indictment were it is claimed acquired from the government under Act June 3, 1878, c. 151, 20 Stat. 89, as amended by Act Aug. 4, 1892, c. 375, § 2, 27 Stat. 348 [U. S. Comp. St. 1901, p. 1547], and known as the "Timber and Stone Lands Act." This act in its first section specifies the qualifications of purchasers or entrymen thereunder and limits the amount of land which each may acquire to 160 acres. The second section provides that the applicant, at the time of his application, shall file a written statement in duplicate under oath with the register, describing the land which he desires to purchase and its quality, that he has made no other application under this act, and that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit, and that he has not, directly or indirectly, made any agreement or contract in any way or manner with any person or persons whatsoever by which the title which he might acquire from the government of the United States should inure in whole or in part to the benefit of any person except himself. It then provides that if he swears falsely he shall be guilty of perjury and forfeit the money which he paid for said lands, and all right and title to the same, and any grant or conveyance which he may have made, except in the hands of bona fide purchasers, shall be null and void. The third section provides that on the filing of the applicant's statement the register shall post a notice of the application in his office for a period of 60 days, and that the applicant shall publish the same notice in a newspaper nearest the location of the premises for a like period of time, and after the expiration of said 60 days, if no adverse claim shall have been filed, the party desiring to purchase shall furnish to the register of the land office satisfactory evidence, "first, that said notice of the application prepared by the register as aforesaid was duly published in a newspaper as herein required; secondly, that the land is of the character contemplated in this act, unoccupied and without improvements," etc., "and upon payment to the proper officer of the purchase money of said land together with the fees of the register and receiver," etc., "the applicant may be permitted to enter said land," and a patent shall issue thereon. It further provides that any person having a valid claim to any portion of the land may object in writing to the issuance of the patent, and evidence shall be taken thereon as to the merits of said objection.

By referring back to the charging part of the indictment, it will be observed that it is not charged that the defendants conspired to procure others to make applications to purchase said lands. The charge is that the conspiracy consisted in hiring others, "and under agreements with them separately to that end to pay to the receiver of the said land office with money to be furnished them by the said corporation the price fixed by law therefor, make entries as individual entrymen at the land office aforesaid," etc. From this it is evident that the certain documents described as "Testimony of Claimant" in the several overt acts had reference to an affidavit required by the land office officials when the claimant appeared at the office after the 60 days' publication, as provided in section 3 of the act. Indeed, this was not denied by counsel for the government on argument.

Defendants demur and move to quash.

Ernest Knaebel, Sp. Asst. Atty. Gen., for the United States.
Clyde C. Dawson and Chas. J. Hughes, Jr., for defendants.

LEWIS, District Judge (after stating the facts as above). 1. The indictment in its charge does not embody the use of criminal means to accomplish the end. So the inquiry is: Do the facts charged constitute a defrauding of the United States within the meaning of the second clause of section 5440 [U. S. Comp. St. 1901, p. 3676]? The offense here considered and found in that section, stated shortly but

fully, is a conspiracy to defraud. The words following "defraud" are only for the purpose of bringing the offense within federal jurisdiction. That section does not define the offense. It is more in the nature of a taking over and an application to federal criminal jurisprudence of the well-defined common-law offense. We do not find the offense there spelled out, but it is just as clear and apparent as if the words had done so. In Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, the Chief Justice tells us:

"The courts of the United States * * * resort to the common law for the definition of terms by which offenses are designated."

And, proceeding further, the Chief Justice there defines the offense named in this section as follows:

"A conspiracy is sufficiently described as a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful by criminal or unlawful means."

So we bear in mind this definition. In a consideration of this indictment it is also equally necessary to bear in mind the timber and stone act (Act June 3, 1878, c. 151, 20 Stat. 89, as amended by Act Aug. 4, 1892, c. 375, § 2, 27 Stat. 348 [U. S. Comp. St. 1901, p. 1547]).

We find that the indictment sets in where the second section of the timber and stone act leaves off. It charges that the purpose of the conspiracy was to "hire and under agreements" with entrymen have them pay for the lands with moneys of the corporation and have them make entries. It does not charge the date on which such hiring and agreements to make entries were to be made, nor that the entrymen were hired to make applications, nor that said hiring and agreements were prior to any application. The indictment appears to attempt to challenge some acts done by the entrymen under the provisions of section 3 of said act, to wit, the hiring of and agreement with entrymen (who had made application before that under section 2 of the act) to make entries and pay for the lands with moneys furnished by the corporation. A violation of section 2 of the act is made a crime and inflicts a forfeiture. It is doubly penal, and, if circumvented, would amply fill the demands of the second clause of section 5440; and a violation of section 3 of the act, as to its material requirements in the giving of "satisfactory evidence," is likewise conceded to constitute a crime, and such conduct, if induced by others, would also constitute a fraud against the government. In the light of such denouncements in sections 2 and 3, and in the absence of any further prohibition, how can we say that it is a criminal fraud for an intending qualified entryman, after his application, to contract to sell in futuro the lands he has made application for with an honest purpose to acquire, and to obtain from his purchaser expectant the funds to make payment? Such a contract has been held valid even before the vendor has entered or made application to purchase, he being in possession at the time. Hussey v. Smith, 99 U. S. 20, 25 L. Ed. 314; Lamb v. Davenport, 18 Wall. 307, 21 L. Ed. 759; Gaines v. Molen (C. C.) 30 Fed. 27.

In Snow v. Flannery, 10 Iowa, 318, 77 Am. Dec. 120, it appeared that plaintiff settled upon one half of a quarter section, and defendant upon the other half, each claiming the quarter. They finally agreed

that plaintiff would withdraw his pre-emption and permit the defendant to prove up on the entire quarter, and that thereafter the defendant should deed to the plaintiff the half that plaintiff claimed at the government price of $1.25 per acre. Plaintiff sued the defendant for specific performance, and one of the defenses was that the contract was in violation of the act of Congress of September 4, 1841 (5 Stat. 456, c. 16, § 12), which declared that:

"All assignments and transfers of the right hereby secured prior to the issuing of the patent shall be null and void."

The court said:

"A contract made before the issuing of the patent to convey after does not violate the letter or spirit of the law, so as to invalidate the contract between the parties. * * * Plaintiff did not violate any law by his contract with the defendant."

In McKennon v. Winn, 1 Okl. 327, 33 Pac. 582, 22 L. R. A. 501, the court had under consideration the validity of a contract made to execute a future conveyance to certain town lots, title to which was at the time of execution of the contract in the United States. It was said:

"It is contended that the contract is one for the sale of an interest in public lands made before the title had passed from the United States, and hence is void as against public policy."

The court then refers to Lamb v. Davenport, 18 Wall. 307, 21 L. Ed. 759, and Hussey v. Smith, 99 U. S. 20, 25 L. Ed. 314, and continues:

"There was no positive law at the time this contract was entered into forbidding the sale of town lots by settlers, and the contract was binding in law."

In Lipscomb v. Nichols, 6 Colo. 290, it appears that a contract was made providing that one of the parties should enter and acquire title to government coal lands and on the consideration named in said contract convey an interest in said lands after title had been acquired by the other party to the contract. Title was acquired from the government by the party who agreed to obtain it, and thereafter a bill filed by the other party for specific performance. To this bill Nichols, who had obtained title from the government, demurred. The court said:

"As to the other point made in the demurrer, that the contract was in violation of the act of Congress providing for the entry of coal lands, we fail to find it supported by the acts referred to. Had this agreement been made respecting the entry of agricultural lands, this point in the demurrer would not have been without force; but the act relating to the entry and purchase of coal lands on the public domain contained in the chapter of the Revised Statutes of the United States concerning mines and mineral lands, is wholly unlike the laws governing the entry and acquisition of title by occupants of agricultural lands. This will be seen by a reference to the act itself, without our quoting it here or discussing its provisions."

In the act of Congress considered in the last case there was no prohibition against the making of the contract.

Of course, in the above cases, a possessory right in the vendors was recognized; but they are not cited here for the purpose of establishing in the defendants or the corporation any rights against the government under the facts charged. They are only invoked to show how such dealings on the part of entrymen with others are characterized—whether criminal; or even unlawful. They are held to be enforceable

contracts between the parties. How, then, can they be made the basis of a criminal conspiracy? Such acts do not involve moral turpitude; such base, corrupt, and malevolent purpose as will constitute a criminal defrauding; such baseness, vileness, and depravity as exists in Curley v. United States, 130 Fed. 1, 64 C. C. A. 369, and United States v. Stone (D. C.) 135 Fed. 393.

In Spring Co. v. Knowlton, 103 U. S. 49, 57, 26 L. Ed. 347, it is said:

"It is to be observed that the making of the illegal contract was malum prohibitum, and not malum in se. There is no moral turpitude in such a contract, nor is it of itself fraudulent, however much it may afford facilities for fraud."

In United States v. Thompson (C. C.) 29 Fed. 86, Judge Deady said:

"It [section 5440] must therefore be construed to include every conceivable case of conspiracy to defraud the United States; that is, to deprive or divest it of any property, money, or other thing otherwise than as the law requires or allows."

But it is said the indictment charges a violation of section 1 of the act in the acquisition of more land by the corporation than there limited. When it comes to that, the indictment does not charge that the several entrymen were disqualified as such, nor that when they made application they had outstanding contracts to sell, or were then acting under agreements or hire for said defendants or said corporation. A compliance with the timber and stone act by the entrymen in both its spirit and letter prior to and at time of application is not challenged by the indictment. Can the court fix a time, other than that found in the enactment, prior to which the entryman may not contract as charged, a violation of which shall be made the basis of a crime? I think not. The views of the Supreme Court in Adams v. Church, 193 U. S. 510, 24 Sup. Ct. 512, 48 L. Ed. 769, are here most pertinent. That was an entry under the timber culture act, which required an affidavit of the applicant that the entry is made for the cultivation of timber for the exclusive use and benefit of the applicant; that the application is made in good faith, and not for the purpose of speculation, or directly or indirectly for the use or benefit of any other person or persons whomsoever; that affiant intends to hold and cultivate the land and to comply with the provisions of the act. The act further provides that eight years must elapse from date of entry before final certificate or patent issues, and the applicant is further required before patent to prove by two credible witnesses that he has planted and for eight years cultivated and protected the required quantity and character of trees, and that a certain number of trees per acre shall then be growing upon the land. The rules and regulations of the land office (but not the statute) required a like affidavit on final proof to the one required by the statute on application. Mr. Justice Day, delivering the unanimous opinion of the court in that case, said:

"It is the contention of the plaintiff in error that these provisions demonstrate the policy of the law to grant the land in question to the person filing the entry, his heirs and legal representatives, and none other, and that to make the sale of an interest in the lands to another as a partner, as is found to have been done in this case, is void as against public policy. * * * There is no requirement in the latter act that the entryman shall make oath that he has not alienated any interest in the land. The policy of the govern-

ment to require such affidavit when it intends to make it a condition precedent to granting a title was indicated in the homestead act, and could readily have been pursued by a similar provision in the timber culture act, if it was intended to extend the principle to that statute. The final proof under the latter act has in view sworn testimony that the number of trees required has been planted, and the prairies theretofore barren of timber have been supplied with trees to the extent required by the law before the title shall pass from the government. The policy of the homestead act, no less than the specific statement in the final oath, looks to a holding for a term of years by an actual settler with a view to acquiring a home for himself. In encouragement of such settlers, and none others, homesteads have been freely granted by the government. This conclusion is in conformity with the decisions of the Land Department in Sims v. Busse, 4 Land Dec. Dep. Int. 369, and United States v. Read, 5 Land Dec. Dep. Int. 313. In these cases the right of the timber culture entryman to dispose of his holding, acquired by him in good faith, before the final certificate, is fully recognized. It is argued that, conceding these decisions to hold that such entryman can sell his claim after entry and before final proof, it does not follow that he can sell it and agree to prove up the entry claim and obtain a patent with a promise to convey it to another, without violating the policy of the law. But as the law does not require affidavit before final certificate that no interest in the land has been sold, we perceive no reason why such contract as was found to exist by the Supreme Court of Oregon would vitiate the agreement to convey after the certificate is granted and the patent issued. If the entryman has complied with the statute and made the entry in good faith, in accordance with the terms of the law and the oath required of him upon making such entry, and has done nothing inconsistent with the terms of the law, we find nothing in the fact that, during his term of occupancy, he has agreed to convey an interest to be conveyed after patent issued, which will defeat his claim and forfeit the right acquired by planting the trees and complying with the terms of the law. Had Congress intended such result to follow from the alienation of an interest after entry in good faith, it would have so declared in the law. Myers v. Croft, 13 Wall. 291, 20 L. Ed. 562. To sustain the contentions of the plaintiff in error would be to incorporate by judicial decision a prohibition against the alienation of an interest in the lands not found in the statute or required by the policy of the law upon the subject."

The same conclusion in principle seems to have been reached by that court in United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384, a suit in equity involving the act now under consideration.

The acts charged against the defendants are not prohibited in the timber and stone act, and we cannot by construction read into that act a prohibition against them, and in such manner by construction hold the acts charged to be in violation of said statute, and therefore illegal or unlawful, for the purpose of constituting the fraud denounced by section 5440.

In United States v. Clayton, 2 Dill. 219, Fed. Cas. No. 14,814, Judge Dillon said:

"The principle that the legislative intent is to be found, if possible, in the enactment itself, and that the statutes are not to be extended by construction to cases not fairly and clearly embraced in their terms, is one of great importance to the citizen. The courts have no power to create offenses; but, if by a latitudinarian construction they construe cases not provided for to be within legislative enactments, it is manifest that the safety and liberty of the citizen are put in peril, and that the legislative domain has been invaded. Of course, an enactment is not to be frittered away by forced constructions, by metaphysical niceties, or mere verbal and sharp criticism. Nevertheless the doctrine is fundamental in English and American law that there can be no constructive offenses, that before a man can be punished his case must be plainly within the statute, and, if there be any fair doubt whether the statute embraces it, that doubt is to be resolved in favor of the accused These

principles of law admit of no dispute, and have been often declared by the highest courts, and by no tribunal more clearly than the Supreme Court of the United States. U. S. v. Morris, 14 Pet. (39 U. S.) 464, 10 L. Ed. 543; U. S. v. Wiltberger, 5 Wheat. (18 U. S.) 76, 5 L. Ed. 37; U. S. v. Sheldon, 2 Wheat. (15 U. S.) 119, 4 L. Ed. 199. And see, also, Ferret v. Atwill, Fed. Cas. No. 4,747; Sedg. St. & Const. Law, 324, 326, 334; 1 Bish. Cr. Law, 134, 145."

In United States v. Wiltberger, 5 Wheat. 76, 95, 96, 5 L. Ed. 37, it was said by Chief Justice Marshall:

"The rule that penal laws are to be construed strictly is perhaps not much less old that construction itself. * * * To determine that a case is within the intention of the statute, its language must authorize us to say so. It would be dangerous, indeed, to carry the principle that a case which is within the reason or mischief of the statute is within its provisions so far as to punish a crime not enumerated in the statute, because it is of equal atrocity or of kindred character with those which are enumerated."

In Smith v. Townsend, 148 U. S. 490, 497, 13 Sup. Ct. 634, 636, 37 L. Ed. 533, Mr. Justice Brewer, speaking for the court, said:

"Statutes against frauds are to be liberally and beneficially expounded. This may seem a contradiction to the last rule: most statutes against frauds being in their consequences penal. But this difference is here to be taken: Where the statute acts upon the offender, and inflicts a penalty, as the pillory, or a fine, it is then to be taken strictly; but when the statute acts upon the offense, by setting aside the fraudulent transaction, here it is to be construed liberally." 1 Bl. Com. 88.

In France v. United States, 164 U. S. 676, 17 Sup. Ct. 219, 41 L. Ed. 595, it is said:

"The statute does not cover the transaction, and, however reprehensible the acts of the plaintiffs in error may be thought to be, we cannot sustain a conviction on that ground. Although the objection is a narrow one, yet, the statute being highly penal, rendering its violator liable to fine and imprisonment, we are compelled to construe it strictly. * * * If it be urged that the act of these plaintiffs in error is within the reason of the statute, the answer must be that it is so far outside of its language that to include it within the statute would be to legislate, and not to construe legislation."

To the same effect, see Francis v. United States, 188 U. S. 375, 23 Sup. Ct. 334, 47 L. Ed. 508; United States v. Benecke, 98 U. S. 447, 25 L. Ed. 192; Taylor v. United States and United States v. Macdonald (both opinions of the Supreme Court rendered November 18, 1907) 207 U. S. 120, 28 Sup. Ct. 53, 52 L. Ed. ——; Todd v. United States, 158 U. S. 278, 15 Sup. Ct. 889, 39 L. Ed. 982. This rule is quite too familiar to demand further extended notice.

From these authorities I understand the settled rule to be that, when it is sought to charge that designated acts constitute a crime under a statute, it is not sufficient that such acts be violative of the spirit and policy of the statute or of the words of the statute, but that they must be violative both of the words and of the spirit and policy of the statute; that is, the acts must fall both within a reasonable meaning of its terms and also within the spirit and scope of the enactment, or, otherwise stated, the acts charged must come not only within the mischief, but fairly within the words. In the light of this time-honored, unbroken, and invariable rule, sustained constantly by all authorities, both ancient and modern, it seems idle to talk about following here the construction placed on the timber and stone act in civil proceedings be-

fore the department, as shown in the Land Office decisions. We all agree that in the determination of civil rights, with which the department only can deal, its construction would be most helpful and valuable to the courts, and the instance would be rare, indeed, in which the courts would find it necessary to depart from the construction there made. As evidence of this it is only necessary to cite Hawley v. Diller, 178 U. S. 476, 20 Sup. Ct. 986, 44 L. Ed. 1157. In the determination of civil rights the words of a statute may be only a dry, lifeless form, to be disregarded if its purpose, scope, and policy, clearly ascertained within its four corners, convince to the contrary; but here, as above shown, we must keep within both the words and scope and policy of the statute.

But it is urged that the criminality of the acts charged here is foreclosed against the defendants by Hyde v. Shine, 199 U. S. 62, 25 Sup. Ct. 760, 50 L. Ed. 90. I think not; for it there appears that both the means to be used to accomplish the end and the end as well were criminal. It is expressly stated that the patent from the state to fictitious persons did not convey title to the state's lands; hence the carrying out of the conspiracy by obtaining from the government its lands in exchange for lands which had been patented to fictitious persons would have been an obtaining of the lands of the government without any consideration therefor.

From the foregoing I conclude: First, that the agreements between the entrymen and defendants, as charged in the indictment, were neither void nor voidable, but were enforceable contracts between the parties; second, that the acts charged are neither prohibited by statute and unlawful, nor mala in se, nor do they involve moral turpitude; hence, whether we consider them either as means to accomplish an end or as the end to be accomplished, they do not constitute a crime. The indictment, therefore, does not charge an offense.

2. The demurrer and motion also challenge the indictment as being duplicitous. It charges that the defendants "on the twenty-fifth day of August in the year eighteen hundred and ninety-nine, and at the several times of the committing of the several overt acts hereafter in this indictment mentioned, and continuously at all times between the said twenty-fifth day of August in the year last aforesaid and the day of the presenting of this indictment, unlawfully," etc., "did conspire," etc. The formation of the conspiracy, and not the overt acts, constitutes the offense. United States v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698; Dealy v. United States, 152 U. S. 546, 14 Sup. Ct. 680, 38 L. Ed. 545; Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419; Ware v. United States (C. C. A.) 154 Fed. 577. Looking now to the overt acts, as we are told we may do in Stearns v. United States, 152 Fed. 900, 82 C. C. A. 48, for the purpose of ascertaining the sense in which terms are used in charging the conspiracy, we find in said overt acts three several dates given. It would therefore appear that this objection is well taken.

But it is insisted that the closing part of the indictment, found after the overt acts are set out, shows clearly that but one conspiracy is charged, and that that was a continuing conspiracy from August 25,

1899, to the date of the presenting of the indictment. And this leads us to another objection raised.

3. Assuming that the indictment does not charge several conspiracies, as above indicated, but that it was one conspiracy continuous from its formation on August 25, 1899, to the presenting of the indictment, we come to consider the plea of the statute of limitations. The first overt act in furtherance of the conspiracy is charged as of date August 25, 1899, and it is insisted by the defendants that, if the indictment charges but the one conspiracy, on the commission of that overt act prosecution could have then been had, and that therefore the statute of limitations began to run as of that date. Against this it is answered that under the doctrine in the Ware Case, supra, every overt act, with "conscious participation" by the defendants in the unlawful combination, works a renewal of the conspiracy. This may be conceded to be the clear holding in that case; but it is evident that that conclusion was there reached on a consideration of the rules applicable to evidence and the particular proof then in hand, which is a very different thing from the rules applicable to pleading, in charging a criminal offense. In that case the indictment charged the formation of a conspiracy within the statute, and, if the proof in such a case sustains the charge, it would be no defense for the defendant to show that a like conspiracy had been theretofore formed and overt acts done thereunder prior to the bar. Taking, therefore, the closing part of the indictment as a part of the charge, it appears that the conspiracy charged against the defendants and all of the overt acts charged thereunder, save the last one, were at a time far more than three years before the filing of the indictment. The reasoning of Judge Deady in United States v. Owen (D. C.) 32 Fed. 534, impresses me as sound. He there said:

"The general rule is that the statute begins to run from the commission or consummation of the crime. Wharton, Crim. Pl. § 321. When was this crime committed? The conspiracy was formed on July 1, 1881, and the first act done by any of the conspirators in pursuance thereof was the making of the alleged false affidavits by Ankenny on December 26, 1881, in relation to the character of the land mentioned therein. The crime was then consummated. The two elements of which it is composed—the conspiracy and the act—were accomplished, and the crime committed. On December 27, 1881, more than five years prior to the institution of this prosecution, an indictment might have been found against the defendants for this crime. This being so, the limitation on the right to institution and prosecution therefor began to run at the same time, and became a bar thereto on that day in 1884."

I think this view is also sustained in United States v. Irvine, 98 U. S. 450, 25 L. Ed. 193.

But, further, the last overt act is of date May 15, 1906, and it is to the effect that the defendants McPhee and McGinnity did unlawfully request and require William Barth (who was the trustee to take title as charged in the indictment) to execute a certain quitclaim deed conveying title to the lands described in the other overt acts to the corporation named in the charging part, as grantee. Now, the language of section 5440 is, "And one or more of such parties do any act to effect the object of the conspiracy." It is contended for the government, and authorities have been cited to that effect, that, if the overt act is charged to have been to effect the object of the conspiracy, it becomes a question for the jury, and not for the court, to say whether

157 F.—18

such overt act was done to effect the unlawful purpose. But in those cases it does not affirmatively appear from the charge that the overt act could not have had such an effect, while here I think it does appear that this overt act could not by any possibility have been done to effect the object of the conspiracy. Bearing in mind the offense charged, to wit, a conspiracy to defraud the United States, is it not apparent that the mere execution of the deed by Barth to the lands could have no such effect? I think it is. The evident purpose of the pleader in inserting this overt act in the indictment is an attempt to toll the limitation of the statute.

Therefore, if we take the first view, the charge is duplicitous, and if the second, prosecution of the offense is barred. The dilemma renders the indictment bad.

The motion and demurrer are sustained.