## UNITED STATES *v.* HUGGETT.

### SAME *v.* DARKESS.

#### (*Circuit Court, N. D. Ohio.* July 1, 1889.)

1. CRIMINAL LAW—OBSCENE PUBLICATIONS—LETTERS.
   Prior to the recent acts of congress, letters were not included in the inhibitions of Rev. St. § 3893, against the use of obscene language in matter deposited in the mails.

2. SAME—CONSTRUCTION OF STATUTES—REASONABLE DOUBT—PENAL ACTS.
   The rule of reasonable doubt, in the construction of statutes, does not apply to· discharge the accused, but the courts enforce a strict construction of penal statutes, confine them within the clearly expressed or necessarily implied meaning of the language used, and will not enlarge them to include conduct equally obnoxious because it is within the mischief to be remedied.

3. FEDERAL COURTS—STARE DECISIS—RANK OF JUDGES.
   Upon distinctively federal questions, the decisions of the supreme court only are technically binding as authority on the inferior courts, and the relative rank of the judges sitting in the circuit courts does not add to the authority of the decisions made, but the value of the rule of *stare decisis* depends upon all alike yielding to the force of the first precedent established on the circuits. Until all the judges pay strict regard to this rule, uniformity under the existing system is impossible.

On Demurrer to Indictment.

Defendants were each indicted for sending through the mails letters which were sealed, but contained language confessedly indecent and obscene. There were demurrers upon the ground that the sending of such letters was not prohibited at the time of the mailing of these particular letters, which was before the passage by congress of the acts of June 18

and September 26, 1888, on that subject. The cases were heard together.

*Robert S. Shields*, Dist. Atty., and *Lee & Brown*, for Huggett.

*A. Farquharson*, for Darkess.

HAMMOND, J. These demurrers present the disputed question whether or not a message or communication in writing from one person to another, of the ordinary and conventional form and style known in common speech as "a letter," deposited in the mails, is within the inhibition of the Revised Statutes, § 3893, if it use language that is obscene within the meaning of that statute. The adjudicated cases being divided, the expressions of opinion are very conflicting, and a case is thought to be now pending in the supreme court requiring its decision of the question. The cases cited in the affirmative of the proposition, and sustaining the indictment, are *U. S.* v. *Gaylord*, 17 Fed. Rep. 438; *U. S.* v. *Hanover*, Id. 444; *U. S.* v. *Britton*, Id. 731; *U. S.* v. *Morris*, 18 Fed. Rep. 900; and *U. S.* v. *Thomas*, 27 Fed. Rep. 682. Those in the negative, and against the indictment, are *U. S.* **v.** *Williams*, 3 Fed. Rep. 484; *U. S.* v. *Loftis*, 12 Fed. Rep. 671; *U. S.* v. *Comerford*, 25 Fed. Rep. 902; and *U. S.* v. *Mathias*, 36 Fed. Rep. 892. No opinion was expressed in *U. S.* v. *Chase*, 27 Fed. Rep. 807, certified to the supreme court; and in *U. S.* v. *Foote*, 13 Blatchf. 418, the judgment proceeded upon a proper construction of the word "notice," as used in this section as it stood prior to the amendment of 1876, and as it may be found in the original edition of the Revised Statutes or the italic print of the second edition. It was there held that under that clause of the statute it was quite immaterial whether the "notice" mailed should be in the form of a letter or some other form. Any "notice" was especially interdicted. Standing so upon the authorities, it may well be held, as it plainly is, at least very doubtful how this disputed question should be decided; and the defendants first insist that, where there is a reasonable doubt, the construction should be in their favor. I am not quite prepared to hold that this rule of reasonable doubt, by analogy to the well-known principle which governs a jury in trying the facts, should exempt the defendants from that penalty which they have incurred if the statute be against them, for this would be to abrogate by judicial action every dubious or doubtful enactment; and the elasticity of language is such, and the carelessness of legislation is so fruitful of ambiguity in drawing statutes, that it would be a dangerous doctrine to establish by that broad expression of it. Nor do I find that the supreme court of the United States has so expressed it in the cases cited for it in *U. S.* v. *Whittier*, 5 Dill. 35; *U. S.* v. *Clayton*, 2 Dill. 219, 226, 12 Myer, Fed. Dec. § 345; and *U. S.* v. *Comerford*, *supra*. That court has undoubtedly enforced the rule of a strict, though reasonable, construction of penal statutes, confines them within the clearly expressed or necessarily implied meaning of the language used, and refuses to enlarge the words to include other conduct of like, equal, or greater atrocity, simply because it may be within the same mischief to be remedied, when it is not fairly included in the language

of the act; but I do not observe that it lays down any rule that a reasonable doubt as to the interpretation of a statute is to be resolved in favor of the accused. *U. S.* v. *Sheldon,* 2 Wheat. 119; *U. S.* v. *Wiltberger,* 5 Wheat. 76, 95; *U. S.* v. *Morris,* 14 Pet. 464, 475; *U. S.* v. *Hartwell,* 6 Wall. 385; *U. S.* v. *Reese,* 92 U. S. 214. Such a formulary of a rule for expounding statutes may be found elsewhere, perhaps, but not in these decisions, I think; and nowhere, it seems to me, can the doctrine mean more than they express. End. Interp. St. §§ 329, 330. Hence it becomes necessary to resolve the doubt according to the proper construction of the statute, however much the court might be inclined to mitigate the punishment, or withhold it altogether, perhaps, because of the ambiguous or misleading character of the language used; but the defendants cannot claim to be discharged because of a reasonable doubt about that construction. But I am of the opinion that the adjudications which have affirmed the validity of these indictments do fall into the very latitude of construction which was condemned by the supreme court of the United States in the above-cited cases; and that upon the somewhat gratuitous assumption that congress intended to purge the mails of all impurity whatever, and that because, forsooth, the use of obscene language in private letters is as impure there as elsewhere, is as offensive, to the addressee, and as much deserves punishment, they have too eagerly held that letters were included in the act. I say upon a gratuitous· assumption, because the history of the legislation shows quite clearly, it seems to me, that, until the recent acts of congress, that body has never come up to the elevated plane of moral action suggested by these decisions, and to be implied from putting this restriction upon the absolute freedom of that form of correspondence, but has especially refused to do that thing. Acts 1888, c. 394, p. 187; Id. c. 1039, p. 496. And this reluctance to interfere with the freedom of private correspondence is readily explainable by the suggestion of Mr. Justice FIELD that congress felt the difficulty of accomplishing its purpose to protect the morals of the people by a wise use of its power over the postal establishment, "consistently with rights reserved to the people, of far greater importance than the transportation of the mail." *Ex parte Jackson,* 96 U. S. 727, 732. Free speech, and particularly free speech in private intercourse, and the aversion of our race of freemen to interference with it, stood somewhat in the way of this legislation, at least in the popular estimation; and this popular sensitiveness upon the subject found its expression in the reluctance of congress to place letters upon the list of expurgated mailable matter. It was akin to the action of a state, having larger jurisdiction and opportunities to protect morals, inhibiting the use of obscene or indecent language in private conversation or speech; and it was this sentiment that protected letters at first, and until congress concluded to take the advanced step. It may be that congress was oversensitive and overcareful; but that the legislation has gone through this process of development is an important consideration in the interpretation of this section of the Revised Statutes. As originally conceived, it was a mere trade regulation for the territory within the exclusive jurisdiction

of the United States, and exclusion from the mails was merely a method of aiding in its enforcement.

The notion that the intention ever was or is now to protect the mails and purify them, or to guard the postal officials from contamination, is, in my judgment, a barren sentimentality that deserves no place in the serious consideration of this statute. Postal officials are not supposed to examine or to appropriate to themselves the indulgences of reading that which goes into the mails in any form, but their duty is to handle and distribute it without doing that. They violate their duty when they so use any mail matter whatsoever, except for the purposes of such official inspection as may be authorized. Therefore it is that this sentiment seems a useless one. But the purpose was, as we have the authority of the supreme court for saying, to refuse the facilities of the postal establishment for the distribution of matter deemed injurious to the public morals. *Ex parte Jackson, supra.* At first, traders were not allowed to use the mails as an instrumentality for administering to depraved tastes, and now the prohibition has been likewise extended to include a purpose of refusing carriage of any message, even in a private letter, which in its language violates the common sense of decency.

Also, I think that in the discussion of this subject too much stress has been laid upon the sanctity of that sealing of mail matter, especially letters, which the postal laws guard so sedulously, as a guide to the proper interpretation of the statute. Judge DRUMMOND effectually disposes of that argument in his opinion by showing that the sealing and paying of letter postage on those articles confessedly inhibited does not remove the inhibition or protect the culprit. It may delay detection, but it does not make the matter mailable; but it does not follow from this that a letter sealed or unsealed is within this statute. No doubt that from the time when postal facilities were first provided in the world, and the governments were first charged with the duty of establishing them, this sealing of letters and documents carried in the mails was protected as a right of the highest importance, without which the postal establishments would become mere freighters; but the consideration of that matter in its relation to the subject we have in hand is fully covered by the suggestion already referred to, of a reluctance on the part of congress to restrict freedom of speech in private correspondence by letters; and except so far as this sanctity of the seal is included in that principle of freedom of private speech I do not deem it of much importance in interpreting this statute, and think it should not be exaggerated, as there is some danger of doing. It might not be an impossible construction of the statute, in my view of it, that a letter, or, as I prefer to express the idea, a written or printed message or communication in the form of epistolary private correspondence, containing obscene thoughts in language which happens to be expressed upon a sheet of paper displaying some obscene "pictures,"—no matter in what style of the art of making pictures, the "letter" and the "picture" having no bearing one upon the other or any other relation, near or remote, except the bare juxtaposition of the two,—I say it might not be impossible that such a "letter,"

being sealed and mailed, would be in violation of this statute as to the "picture," and yet not as to the "letter," unless, indeed, the whole would be excluded from the denunciations of the statute by a necessary implication upon the words of the act that it is only "every letter upon the envelope of which" the "picture" or other offending matter appears that is comprehended within the statute. And to satisfy hypercriticism "envelope" might be conceded to mean the outside surface of a letter not inclosed in a jacket or like covering known as "envelopes."

Once more, in this process of limiting, if not discarding, some of the seemingly misleading arguments which have gathered about this question, and that may be somewhat beside it, there appears to me at least to be but little of importance in the notion that the grievance of the addressee, whose sense of indignation is aroused, and whose feelings are injured, by such letters, is to be redressed by this statute. Perhaps it is not within the competency of congress to redress such grievances, but certainly I think it was not its intention to redress them even by these latest acts that do include letters within the prohibitions of the legislation. It may be that, until congress, exercising its power of postal regulation, takes another step in advance, and authorizes seals of letters to be broken, and contents inspected at the will or upon the suspicion of postal officials, this grievance of the addressee furnishes the only method of detection, accusation, and punishment, and the only guaranty for the enforcement of the statute; but *non constat* that congress intended by this legislation to provide a redress for such grievances, or that we should so view this statute in construing it.

The simple question is: What, upon a proper legal construction of this section, has been denied carriage in the mails; the denial being enforced by a penalty for the non-observance of the postal regulation? Or, more nearly to this case: Has this letter been excluded by the language of the act? A latitudinarian construction that shall include it because it is as hurtful to morals as other things that are excluded is denied to us by the supreme court, as already shown. The conclusive fact against including it is that from the beginning of the legislation to the recent acts, which do specifically include "letters," they have never been mentioned as such in the list of prohibited mail matter, nor referred to in the statute, except in a phrase which by fair implication shows that they were designedly left out of that list when congress says that there shall be included "every letter upon the envelope of which"—and it may be conceded that this means upon the outside surface of which—the obscene language, etc., appears. Now, from the earliest appearance in our civilization of postal carriage, whether by private or public establishment, the "letters" have been that class of "mail matter" with which and about which there has been most concern; so much so, that the idea of "a letter" and postal carriage are quite inseparable, when we have in mind the postal service and its regulation. It has become, in that relation, a technical word, a superior word, a word to represent a class of mail matter that is in every possible sense of so high a grade that all else becomes inferior in classification and in enumeration to it. It stands first in pos-

tal concerns, and nothing is even equal to it. Historically, in practical operation, and in popular knowledge and esteem, this is so, and the general rule of construction is that in legislative enumeration the inferior does does not include the superior. End. Interp. St. § 412, p. 579. I have taken the trouble to examine with care the legislation concerning our postal affairs, and do not find a single instance where congress has ever used any other word to include "letters" than that word itself, except such expressions as "the mail," "mail-matter," "bag or mail of letters," etc. It is sometimes used generically to describe mail matter of other classes than "letters," as when the statutes speak of "letter-carriers," "letter-boxes," etc.; but whenever the legislation in hand requires specific classification or enumeration, I find no word ever substituted for "letters," to express that which is commonly known as letters in relation to the postal service. We have "letter and newspaper envelopes," "letter correspondence," "registered letters," "unclaimed letters," "dead letters," "request letters," "non-delivered letters," "all letters and other mail matter," "foreign letters," "letters or packets," "letters and packets," "letter postage," "letter mail," "letter and other mail matter," and such like, almost innumerably; and these I have taken quite at random from the Revised Statutes. Can it be possible that congress, then, wishing to include "letters" in any particular and accurate enumeration shall drop that word so imbedded in our postal laws and that of our ancestors beyond the sea, and adopt some unfamiliar, inferior, and in every sense ambiguous term to express the idea? It does violence to the intelligence of congress to think so. If letters were intended to be included in this statute, why resort to any enumeration at all such as it contains, when the generic term "mail matter," which has grown up in modern legislation as a substitute for the old-fashioned "letters and packets," was at hand to include everything? The truth is that our postal establishment has been so enormously extended in the direction of becoming a common carrier of goods and merchandise, and those articles or contrivances used to advertise, sell, and distribute them, particularly those of a literary character, that when congress goes to deal with such articles permitted in the mails it must adopt enumerations hitherto unknown to postal terminology; but the word "letters" always appears when it deals with the ordinary postal article known by that name. Its omission under such circumstances means its exclusion. Moreover, there are other statutes of a like character and purpose with this which do not omit specific references to "letters" in dealing with the prohibitions enforced, and why should they be omitted from this act, unless it were intended not to include them by such omission? For example, the very next section of the Revised Statutes to that which we are considering relates to a prohibition concerning lotteries and gift enterprises, and forcibly illustrates the argument we are attempting here by beginning its inhibition with the phrase "no letter or circular, etc., shall be carried in the mail;" registered letters are to be stamped "fraudulent," and returned when they concern these enterprises, (Rev. St. § 3929;) and money orders relating to them are to be refused payment, and remitted, but the officials are

not to open any letter, (Rev. St. § 4041.) Again, in protecting the people against the use of the mails as an instrumentality for working schemes intended for the purposes of fraud, congress uses the words "place any letter or packet," etc., and follows it with a general prohibition against "misusing the post-office establishment," and its "abuse" for such purposes. Rev. St. § 5480. And, in regulating the carriage of "letters and other mailable matter" by foreign vessels from the ports of the United States, the officials, under certain restrictions, may open and inspect any packages supposed to contain mailable matter, etc., but not "the letters" themselves, and detain them for postage; and "all letters or other mailable matter," except such "sealed letters," relating to the vessel or cargo, etc., shall be delivered by the master to the post-office, etc.; and these regulations for conveying "such letters or any letters intended to be conveyed," etc., are enforced by criminal penalties and punishments. Rev. St. §§ 4015, 4016. Section 3994 prefers the "letter mail" to "other mail matter" in the regulation of its carriage; and, in a word, scarcely any postal statute or regulation concerning the post-office establishment fails to exhibit this sedulous care for "letters" and the "letter mail" in every direction possible; and it is quite inconceivable that congress should in the act we are construing have departed from this legislative habit, and undertaken to regulate so important a matter as it concerns by the mere use of the nondescript and uncertain word "writing," when in the very statute itself and all other statutes the words "all letters, packets, and other mail matter," so constantly appear in this or some equivalent form. The word "letter" is found defined, as we define it here, by many adjudicated cases cited in the books and by the lexicographers, while its technical bearing in the language of the postal service is self-evident, and appears everywhere that conversation occurs among the people about the mails. Bouv. Dict. tit. "Letter;" Lawson, Conc. tit. "Letter;" Stim. Amer. St. Law, § 4074, p. 447; *U. S.* v. *Bromley*, 12 How. 88; *Dewees' Case*, Chase, Dec. 531; *Chouteau* v. *The St. Anthony*, 11 Mo. 227; *Dwight* v. *Brewster*, 1 Pick. 50. It is undoubtedly true that in a certain sense "a letter," even in the technical meaning of the term, as above described, is a "writing," and also it is true that a "book," or "pamphlet," or "paper," or "print" is in a certain sense a "writing," and it is not impossible that "a picture" might be held to be. Webst. Dict.; Bouv. Dict. tit. "Writing;" Lawson, Conc. tit. "Writing;" *Henshaw* v. *Foster*, 9 Pick. 312, where there is an extensive discussion of the word "written," in a state constitution, and it was held to include "printed" words. And by the statutory enactment of many states it is declared to include "printing," "engraving," "lithography," etc. Stim. Amer. St. Law, § 1023, p. 140. By the rule of *noscitur a sociis* it might be so limited here in this statute. Broom, Leg. Max. 588, 651; End. Interp. St. § 396 *et seq.;* Id. 400. But this rule, like all others, yields to the general intention clearly expressed, and is not always strictly enforced. Id.; *U. S.* v. *Lawrence*, 13 Blatchf. 211; *Wilkinson* v. *Leland*, 2 Pet. 628, 662; *U. S.* v. *Hartwell*, 6 Wall. 385; *Oates* v. *Bank*, 100 U. S. 239. Hence it may have a larger meaning than its associated words in this statute may imply, but not neces-

sarily its largest meaning; and for the reasons already stated should not include in such a statute as this the technical and always natural word "letters," when used to express the kind of "writing" we have involved in the case at bar. It may include any other "writings," perhaps, but not those known by a more familiar, natural, and, in postal rules and regulations, technical, term as "letters," unless, indeed, the statutory intention to so include them is far more clearly manifested than it can reasonably be said to be in this statute. It is conceded that they were not included in the original act, but it is contended that the insertion of this dubious word "writing" was intended to apply it to them by the amendment of 1876. The fact of insertion by amendment perceptibly increases the force of the rule of association; but it may be conceded that the intention was to include such writings, for example, as manuscripts going to the publisher or returning from him, pleadings or records in legal proceedings, documents of any kind in written form, or partly in writing and partly in print, and all the innumerable forms of conveying information or ideas that are obscene and indecent through the mails, whether sealed or unsealed, and yet not to include letters, whether sealed or unsealed.

I have not thought that the word "publication," as used in this statute, had the least reference to that term as we use it in legal parlance, in the law of slander and libel, for instance, or when we say a deposition is to be "published" or the like, but solely in the sense we use it when we speak of "publishing" books, pamphlets, circulars, papers, etc. And the insertion of the word "writing" by the amendment of 1876 does not necessarily apply the term "other publication" so as to limit the class of "writings" to those in some sense "published," as already intimated; but while this may be conceded, we need not concede, and I do not think it should be admitted as a proper construction, that the term "writing" should be extended to include all writings of every kind, including private letters, sealed or unsealed. Dubious words ought to be taken most strongly against the law-makers. *U. S.* v. *Heth,* 3 Cranch, 399, 413. One has only to examine the legislative proceedings attending the passage of the recent acts of congress to see that that body did not consider letters within the former statute. The act of June 18, 1888, c. 394, did not include them, while obviously prohibiting the display of offensive matter upon the envelopes and wrappers, including injurious reflections upon one's character, instigated as we all know by the use of the mails by money collecting agencies to compel by such threats, designs, and offensive epithets delinquent debtors to pay their delayed debts. It was not until September 26, 1888, (chapter 1039,) that congress reached the state of mind necessary to place within this legislation private letters. So considered, the existence of these recent acts shows that congress had not interpreted the former acts to include letters. *U. S.* v. *Freeman,* 3 How. 556.

The district attorney, in his brief, refers to the fact that some of the opinions are by circuit judges, and are said to have been approved by circuit justices, though they have no reported decisions on the subject,

and that these should have more influence as authority. Strictly and technically none of the decisions by any of the judges are of authority, and on the circuit I take it all the judges stand alike in this matter, supposed distinctions in rank not adding anything to the authoritative effect of judgment or opinions. Whichever judge holds the circuit court, it is the judgment of the court, and can be no more or less authoritative because of these distinctions. It would be intolerable if it were otherwise. Unfortunately, owing to our very absurd judicial system, it seems quite impossible to introduce into it the rule of *stare decisis*, as between the different circuits and in the courts inferior to the supreme court; the decisions of that tribunal alone being binding as authority upon all. If the first judicial decision of this question had been followed as a precedent, there would have been no conflict of authority, and "letters" would have been excluded from the operation of this act. But Judge DEADY's careful judgment was by him all too graciously, perhaps, made to yield to mere statements that other judges in his circuit thought differently, and without any published opinions from them. Other courts felt at liberty to disregard the first precedent, and so we have them all acting independently in judgment. This may be deplorable, but it is inevitable, unless all will yield to the first careful and intelligent decision as a precedent, strictly considered.

On this class of questions, altogether and absolutely within the federal jurisdiction, such a rule of judgment would be valuable, and I consider that in this case, substantially, we are following that rule, and that this judgment is fairly in the line of precedent. Demurrer sustained.