LAMB *v.* DAVENPORT.

1. Unless forbidden by some positive law, contracts made by actual settlers on the public lands concerning their possessory rights, and concerning the title to be acquired in future from the United States, are valid as between the parties to the contract, though there be at the time no act of Congress by which the title may be acquired, and though the govern- ment is under no obligation to either of the parties in regard to the title.
2. The proviso of the Oregon Donation Act of September 27th, 1850, which forbade the *future* sale of the settler's interest until a patent should

---

* 2 Parsons's Maritime Law, 686, note; 2 Parsons's Shipping and Ad· miralty, 390; Benedict's Admiralty, ¿ 425.

' issue, so far from invalidating contracts for sale made before its passage, raises a strong implication in favor of their validity.

3. Whether the husband or wife who takes as survivor the share of the deceased under the said Donation Act, takes as purchaser or by inheritance:- *held*, that contracts of the husband concerning the equitable interest of the part allotted to him, made before the act was passed, are binding on the title which comes to his children by reason of a patent issued after the death of both husband and wife.

APPEAL from the Circuit Court for the District of Oregon; the case being this:

Prior to March 30th, 1849, one Lownsdale was in control of what was then known in Oregon Territory as "a land claim;" that is to say, he was in possession, claiming it as owner, of a tract of land. The tract contained 640 acres. Thinking it a good site for a town, he laid it out in blocks and lots, which he offered for sale. Several lots were sold; a town grew upon them, and the city of Portland now stands upon the "claim."

At the date named the fee of the whole Territory was in the United States; and, of course, Lownsdale had no patent, nor indeed any warrant, survey, or title of any kind from the government. Nevertheless such "claims" were recognized by the immigrants, to a greater or less degree among themselves. The holders of claims sold them in whole or divided; agreeing to get a patent; and the hope and expectation of all parties was that the government, in time, would acknowledge the validity of what had been done.

On the 30th of March Lownsdale transferred his claim to one Coffin, excepting from the transfer the blocks and lots which he had already sold. Coffin agreed to endeavor to obtain title to the whole 640 acres from the United States; and both parties agreed that they would contribute equally to all expenses, and divide equally the proceeds of sales of lots, &c., so long as the agreement should remain in force, and that when it should be dissolved by consent Coffin should convey Lownsdale one-half the land remaining unsold.

In November, 1849, Coffin sold to one Fowler two lots, which were numbered Nos. 5 and 6, in block 13, and Fowler sold them in January, 1854, to one Davenport.

On the 13th of December, 1849, Lownsdale and Coffin entered into an agreement with one Chapman, by which, describing themselves as joint owners of the claim, they sold to him an undivided third part of it, the town lots and improvements; it being agreed that the three contracting parties should be equal partners in said property, except as to town lots already sold, and should, take steps to obtain title from the United States. They were each to enter upon the business of selling the lots and account to each other for the proceeds.

On the 27th of September, 1850, Congress passed what is called "The Oregon Donation Act."* By its fourth section the act gave, on certain terms, to every actual settler (if a single man) a certain amount of land, 320 acres; and if a married one, twice the amount; in this latter case " onehalf to himself and the other half to his wife, to be held by her in her own right." The act went on to say:

"And in all cases where . . . either shall have died before patent issues, the survivor and children or heirs of the deceased shall be entitled to the share or interest of the deceased in equal proportions, except where the deceased shall otherwise dispose of it by testament."

It contained also a proviso, thus:

"*Provided*, That all *future* contracts by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act before he or they have received a patent therefor, shall be void."

In this state of things, on the 10th of March, 1852, and after the passage of the act, the said three partners, by deed, reciting therein that in order to obtain title from the United States it was necessary that each should designate the precise and particular portion of said land claim which each, by agreement with the other, claimed, in order that he might obtain a patent, as a preliminary measure, entered into certain covenants *with each other under seal.* It was re-

* 9 Stat. at Large, 496.

cited that they had sold lots to each other and to third persons, obliging themselves to make to the grantees deeds of general warranty, wherein the grantor should obtain a patent from the United States, and the said three parties mutually covenanted that each would fulfil all contracts he had made with each other or with other persons, and also that when a patent should be obtained, he would make good deeds for all lots patented to him which had been sold by the said parties jointly or any of them separately, such deeds to be made to the original grantee or his assigns.   They also covenanted to endeavor to obtain title from the United States, and not to abandon their claim, &c.

On the next day, 11th of March, 1852, Lownsdale made before the surveyor-general, under the Donation Act, his designation of the part of the land claimed by him.

In January, 1857, Coffin (already mentioned as the person to whom Lownsdale, in March, 1849, transferred his claim) sold two other lots, in block 13, Nos. 2 and 7, to a purchaser who soon afterwards sold them to Davenport, who had bought, as we have said, Nos. 5 and 6 in the same block.

Lownsdale was a married man.   Accordingly, under the Donation Act, Mrs. Lownsdale was entitled to 320 acres, and Lownsdale himself to a like amount.   Mrs. Lownsdale's half was set aside.   It did not include the four lots sold by Coffin; but Lownsdale's half did.

On the 17th of October, 1860, a patent certificate issued to Lownsdale.   He died May 4th, 1862, his wife having died not long before him, leaving him and four children surviving. By the laws of Oregon, in such a case, the wife's estate is directed to be divided between the husband and children "in equal proportions;" though whether this meant, in this case, that the husband should have one-half or one-fifth, was not so clear.

On the 6th of January, 1865, that is to say, after Lownsdale's death, a patent issued, conveying to Lownsdale his half of the tract; this part including, as already said, the lots 5, 6, 2, and 7, in block 13.

By the common law, of course, such a patent would have

been void.  An act of Congress of May 20th, 1836,* gave it validity by enacting,

"That in all cases where patents for public lands have been . . . issued to a person who had died . . . before the date of such patent, the title to the land designated therein shall enure to, and be vested in, the heirs, devisees, or assignees of such deceased patentee, as if the patent had issued to the deceased person during life."

Whatever Lownsdale's interest was, vested, therefore, in his heirs.

In this state of things, Lamb and others, who were a portion of his heirs, filed a bill against the residue of them, to have a partition of these lots; and made Davenport a party as a person in possession and claiming the whole of them.

In the progress of the suit, Davenport filed a cross-bill, in which, while admitting the legal title to the lots to be in the plaintiffs and the other heirs of Lownsdale before the court, he asserted that he was the rightful and equitable owner of them, and prayed for a decree against the heirs of Lownsdale for a conveyance of the title.

The court decreed as prayed by Davenport, and the complainants in the original bill brought this appeal.

*Messrs. G. H. Williams and W. L. Hill, for the appellants:*

Prior to the 27th of September, 1850, the date of the passage of the Donation law, neither party to this controversy, nor those under whom they claim, except the United States, had any title to, or interest whatever in, the premises in dispute, or in said land claim.  This, in effect, was so declared by the Supreme Court of the United States in the case of *Lownsdale* v. *Parrish.*†  The Supreme Court of Oregon, in *Leland* v. *City of Portland,*‡ says:

"Any acts (of parties) before the 27th of September, 1850, affecting the disposal of lands in Oregon were simply void."

It follows that no form of conveyance made prior to the

---

* 5 Stat. at Large, 31.                    † 21 Howard, 293.
‡ 2 Oregon, 48; and see Lownsdale v. City of Portland, Deady, 1.

passage of the Donation Act could operate to transfer any interest, either legal or equitable, in the land, and that a conveyance, without covenants for further assurance, would be ineffectual for any purpose, except perhaps to transfer the bare occupancy. A purchaser could not have been deceived. He must have known that he could obtain nothing but naked possession, no matter what the deed said.

Again, the fourth section of the Donation Act invalidated all future sales of lands which the act gave, if made before the party got a patent.

The result was that prior to the 27th of September, 1850, parties had no interest whatever in land in Oregon, and that while after that time they could acquire the title thereto, their contracts for the sale thereof, before their title became complete under the provisions of the act, were void. We submit, therefore, that Davenport could derive no benefit from any so-called sale of the four lots in question made subsequent to the aforesaid date, nor claim them on account of any deed made prior to that time; and that all such contracts and deeds must be construed in view of this condition of circumstances.

This invalidates the whole of the tripartite agreement of March 10th, 1852 (the latest written agreement between Lownsdale, Coffin, and Chapman); for it was all made after the passage of the act.

The Donation law was not retrospective in its operation, nor did it vest rights of an equitable character which related back to the date of the settlement. There is nothing in the act that justifies the position that it did.

Descending more to particulars, and as to Davenport. To no one of the four lots did Davenport acquire any title till after the date of the Donation Act, while as to two of them, Nos. 2 and 7, even Coffin's conveyance of them was posterior to the act. The sale to him in the case of each one of the four lots was the sale of lands by a party who was claiming the benefits of the Donation Act, and, to say the least, came within the mischief which the prohibitory clause in question was intended to prevent.

Further.   The agreement of March 10th, 1852, is a deed, *inter partes;* Lownsdale, Coffin, and Chapman.   We know of no principle of law which would allow Davenport, a person not a party to the instrument (an instrument under seal, and executed as that evidently was, *to settle and adjust the personal individual rights of the parties to it as between themselves*), to claim the benefit of its provisions as a matter of legal right.*

Finally.   Under the Donation Act, the heirs of Lownsdale, he being dead before the patent issued, took not by descent but by purchase.† They took not through him, but under the act.   The land which Congress thus gave them would not have been subject to his debts, nor is it to his contracts.   It never vested in him.   In *Davenport* v. *Lamb,*‡ the Circuit Court held that under the act the husband did not take as heir to his wife, but as statutory donee, and this view was not denied in this court.

*Messrs. J. M. Carlisle and J. D. McPherson, contra.*

Mr. Justice MILLER delivered the opinion of the court.

There is no question that at the commencement of the suit the legal title to the lots was in the heirs of Lownsdale.

The equity which Davenport sets up in his cross-bill, arises from transactions antecedent to the issue of the patent certificate of Lownsdale, and indeed antecedent to the enactment of the Donation law by Congress, under which Lownsdale's title originated.

It is not necessary to recite in this opinion all of those transactions.   It is sufficient here to say that several years before that act was passed, and before any act of Congress existed by which title to the land could be acquired, settlement on and cultivation of a large tract of land, which includes the lots in controversy, had been made, and a town

---

* See Ellison *v.* Ellison, 1 Leading Cases in Equity, 232*.

† Fields *v.* Squires, 1 Deady, 382; Delay *v.* Chapman, 3 Oregon, 459.

‡ 13 Wallace, 431.

laid off into lots, and lots sold, and that these are a part of the present city of Portland. Of course, no legal title vested in any one by these proceedings, for that remained in the United States—all of which was well known and undisputed. But it was equally well known that these possessory rights, and improvements placed on the soil, were by the policy of the government generally protected, so far, at least, as to give priority of the right to purchase whenever the land was offered for sale, and where no special reason existed to the contrary. And though these rights or claims rested on no statute, or any positive promise, the general recognition of them in the end by the government, and its disposition to protect the meritorious actual settlers, who were the pioneers of emigration in the new Territories, gave a decided and well-understood value to these claims. They were the subjects of bargain and sale, and, as among the parties to such contracts, they were valid. The right of the United States to dispose of her own property is undisputed, and to make rules by which the lands of the government may be sold or given away is acknowledged; but, subject to these well-known principles, parties in possession of the soil might make valid contracts, even concerning the title, predicated upon the hypothesis that they might thereafter lawfully acquire the title, except in cases where Congress had imposed restrictions on such contracts.*

Acting on these principles, the tract of land in question, valuable for a town site, seems to have become the subject of controversies, and of contracts and agreements, which culminated in an amicable arrangement between Lownsdale, Coffin, and Chapman, by which the rights of each were recognized and adjusted among themselves. The first of these agreements, reduced to writing, was made before the passage of the Donation law. The last seems to have been made in consequence of that enactment, and was evidently designed to give effect to their previous compromise agree-

* Sparrow v. Strong, 3 Wallace, 97; Myers v. Croft, 13 Id. 291; Davenport v. Lamb, Ib. 418; Thredgill v. Pintard, 12 Howard, 24.

ments, to enable each to acquire under that act the title to the property, according to those agreements, and to protect each other and their vendees when the title should have been so acquired. We are satisfied that by the true intent and meaning of these agreements the equitable right to all the lots in controversy had been transferred by Lownsdale to Coffin before the passage of the Donation Act, and that, as between Lownsdale, Coffin, and Chapman, the equitable interest, such as we have described it, of the lots in controversy, was in Coffin or his vendees.

The record shows that this interest or claim, whatever it was, at the commencement of this suit was vested in Davenport, while the legal title was in the heirs of Lownsdale.

According to well-settled principles of equity often asserted by this court, Davenport is entitled to the conveyance of this title from those heirs, unless some exceptional reason is found to the contrary.

Counsel for appellants urge two propositions as inconsistent with this claim of right on behalf of Davenport:

1. It is said that the proviso to the fourth section of the Donation Act renders void the agreements between Lownsdale, Coffin, and Chapman. The proviso referred to declares that all future contracts by any person or persons entitled to the benefit of this act for the sale of the land to which he may be entitled under the act, before he or they have received a patent therefor, shall be void. The act was on its face intended to cover settlements already made, and the careful limitation of this proviso to *future* contracts of sale, that is, sales made after the passage of the act, raises a strong implication of the validity of such contracts made before the passage of the statute. It was well known that many actual settlers held under such contracts, and while Congress intended to protect the donee from future improvident sales, it left contracts already made undisturbed.

But counsel, resting solely on the latest written agreement between Lownsdale, Coffin, and Chapman, insist that it was void because made after the Donation Act was passed.

That agreement was only designed to give effect to the

previous contracts on the same subject, and is in accord with the spirit of the proviso. And if this latter agreement is rejected as altogether void, it is still apparent that by the contracts made prior to the Donation Act, the equitable right of Coffin to these lots is sufficiently established.

The same error is found in the argument that two of the lots in controversy were sold by Coffin after the passage of that act, and the sale is, therefore, void. The answer is that Coffin is not the donee who takes title under the act of Congress, but Lownsdale, and Lownsdale had made a valid agreement by which his interest in them was transferred to Coffin, before that statute was passed.

2. The Donation Act provides that where the settler has a wife, the quantity of land granted is double that to a single man, and that one-half of it shall be set apart to the wife by the surveyor-general, and the title to it vests in her, and that if either of them shall have died before the patent issues, the survivor and children, or heirs of the deceased, shall be entitled to the share or interest of the deceased.

Lownsdale's wife died first, and both before the patent issued. But prior to the death of either, Mrs. Lownsdale's half had been set apart to her, and did not include the lots now in controversy. It is said that the title vested in the heirs of Lownsdale, under the peculiar provision of this statute, is one of purchase and not of inheritance, and that it comes to them directly from the government, divested of any claim of third parties under Lownsdale.

This proposition was much discussed in the case of *Davenport* v. *Lamb,*\* but the court did not then find it necessary to decide it, as the only parties who were entitled to raise the question had not appealed from the decree of the Circuit Court.

Nor do we propose to decide now whether the title in the hands of the children and heirs of Lownsdale would be liable for his debts, or to what extent that title might be affected by the contracts of Lownsdale, concerning the land

---

\* 13 Wallace, 418, already cited.

itself, made *after* the passage of the Donation Act, or after his assertion of claim under it. Nor do we decide whether the interest in the wife's share of the land which came to him by survivorship, would be affected by any contracts of his or hers, made before her death at any time.

But we hold that as to the portion of the land which was allotted to him by the surveyor-general, and the title of which vests in his heirs by the act of 1836, without which the patent would be void, his contract of sale made before the Donation Act was passed, and while he was the owner of the possessory interest before described, was a valid contract, intentionally protected by the Donation Act itself, and binding on the title which comes to his heirs by reason of his death.

These considerations dispose of the case before us, and the decree of the Circuit Court is accordingly

AFFIRMED.