Mantooth vs. Burke.

## MANTOOTH vs. BURKE.

1. IMPROVEMENTS ON PUBLIC LANDS:   *Contracts concerning.*

Parties holding improvements upon public lands may make valid contracts concerning them, irrespective of title to the lands; and so an agreement between the owners of improvements on adjoining quarters of public land, that each might occupy and use his improvement extending upon the other's quarter and withdraw his fence to the true line when ascertained, is valid and binding upon them and their assigns having notice of the agreement; and either may lawfully enter upon the other's quarter, though he has obtained the legal title to the land, and withdraw his overlapping fence to his own quarter.

Mantooth vs. Burke.

2. LICENSE: *When irrevocable.*

A license, coupled with an interest and given for a consideration, can not be revoked.

3. ESTOPPEL.

One who acquires possession of land by recognizing another's claim can not afterwards repudiate it.

APPEAL from *Franklin* Circuit Court.

Hon. W. D. JACOWAY, Circuit Judge.

*Clark & Williams*, for appellant.

*Fielder*, contra.

EAKIN, J. Appellant, Mantooth, together with the Little Rock and Fort Smith Railway company, sued Burke in what, before the Code, would have been an action of trespass *quare clausum fregit*, complaining that he had, in February, 1878, entered upon their land, unlawfully and by force, and carried away 700 panels of fence, and had cut and removed timber and converted it to his own use, and had trod down, depastured, and destroyed by cattle, plaintiff's growing wheat. The railway company was, in the course of the suit, by leave of the court, withdrawn from the complaint, and prosecutes no claim. Values are alleged of the different species of property injured, and damages for the whole claimed at $900.

Burke answered, specifically denying the unlawful or violent entry.; the plaintiff's ownership of the fence panels; the cutting and carrying off the timber ; and the injury to plaintiff's wheat, as charged. But says, in effect, that the rails taken were his own, consisting of about 567 panels of ten rails each, which he had purchased and paid for long before plaintiff came into possession of the land, and which

were removed by him at the time alleged under the follow-
ing circumstances:

About the year 1870, defendant purchased of John Pen-
dergrass certain improvements and a pre-emption right on
the southwest quarter of section 6, township 8 north, range
27 west, then belonging to the United States. The rails in
question constituted a portion of the improvements, being
on a fence which was " a conditional dividing line" be-
tween that and the southeast quarter of the section, to
remain until title should be acquired, and a correct line
established, when defendant was to have the right to re-
move the rails to the true line, and meanwhile to have the
control of the fence, and occupation and use of the lands
lying west of it in the improvement. This occupancy and
control defendant enjoyed, without let or hindrance from
any one claiming or occupying the said southeast quarter
of the section, up to the time of the acts of which plaintiff
complains. He perfected his title on the twenty-fourth of
July, 1876, by purchase from the Fort Smith railroad, and
afterwards sowed the field in wheat. At that time, L. O.
Franklin, occupying the said southeast quarter, which is
the *locus* of the alleged trespass, having full knowledge of
the facts as above stated, acquiesced in them and in all
things consented. Franklin sold his interest in the south-
east quarter to the plaintiff, Mantooth, informing him
before and at the time of the sale of defendant's rights in
the improvements, according to the facts as above stated,
and Mantooth on his part assented to the same and agreed
that defendant should remove his fence at his option.
When the true line between the two quarter sections was
ascertained, it was found that defendant's fence and im-
provements extended over on to the southeast quarter,
whereupon he removed the fence within his own line, and

threw out a portion of the wheat, which was destroyed. This, it is alleged, was the supposed trespass.

A demurrer to the answer was overruled, and, after several mistrials, a verdict, by a jury, was rendered in favor of defendant.

There was proof conducing to show that defendant purchased the improvements on the southwest quarter from Pendergrass in 1870, a portion of which, as was afterwards ascertained, extended over upon the southeast quarter. Pendergrass owned improvements on that quarter also, a portion of which it was supposed would extend over the southwest quarter, sold to defendant. Both quarters were government lands. About the same time Pendergrass sold the improvements on the southeast quarter to one Vick, when it was agreed amongst all three that defendant and Vick should each occupy their improvements as they were until they might acquire their titles and the true line between the quarter sections be established, when each party would be entitled to withdraw his fences inside of his own lands. That defendant occupied his improvements under said agreement until the time of the alleged trespass, and in the year 1876 by right of pre-emption he purchased the quarter section from the Fort Smith railroad, as an actual settler, under the state act of 1878. Vick afterwards sold his improvements to Franklin, who had notice of defendant's claim and assented thereto. Franklin afterwards sold the improvements on the southeast quarter to plaintiff, who acquired title also from the railroad, had the line run, and ascertained, as was formerly supposed, that defendant's field extended some twelve or sixteen acres upon the southeast quarter. Meanwhile defendant had sown it in wheat. Mantooth claimed the rails and the wheat, and refused to

permit defendant to remove the rails to his own line, which he nevertheless did.

Franklin testified that when he sold to plaintiff Mantooth, he verbally excepted from the sale the improvements on the west side of the quarter section, that is, the rails and fence, telling him they belonged to defendant Burke, and that Mantooth assented to the arrangement. This Mantooth, in his testimony, denied.

A list of eight somewhat lengthy instructions was given for the defendant against the objections of plaintiff.

The court, for the plaintiff, instructed that defendant, in his pleading, did not deny plaintiff's title to the whole southeast quarter of the section. The whole issue was, whether or not defendant unlawfully entered upon it and took away the rails, and did the other injurious acts alleged; that if they found he had failed to show justification, they should render a verdict for plaintiff.

Four other instructions asked by the plaintiff were refused.

Judgment was entered for defendant in accordance with the verdict. The plaintiff moved for a new trial, which being refused, he tendered a bill of exceptions, and appealed.

It is to be inferred from the evidence, that the land in question lay within the scope of the grant of lands from the United States for the use of the Cairo and Fulton railroad, and fell to the Little Rock and Fort Smith branch of the same. This, as frequently happens with regard to local matters well known to the judge, jury and attorneys, seems taken for granted.

1. IMPROVE-MENTS ON PUBLIC LANDS: Contracts concerning upheld.

The courts of this state have always recognized improvements upon the public lands as property; and have upheld contracts between the owners of them, when fair and rea-

sonable, not only with regard to the improvements, but also executory contracts with regard to the *title* to the lands themselves, to be afterwards acquired, so far as may be necessary to secure the enjoyment of improvements crossing lines. (*Hamilton et al. v. Fowlkes et al., 16 Ark., 340.*) They give the owner a possessory right against all the world but the United States. (*Pelham v. Wilson, 4 Ark., 289; Cain v. Leslie, 15 Ark., 312; Earle, Admr., v. Hale, 31 Ark., 470*). They are assets in the hands of an administrator (*Gantt's Digest, sec. 69*); may be recovered in ejectment (*ib., secs. 2254, 2255*), or sold and assigned (*ib., sec. 3907*).

Although *stricti juris*, the settler upon public lands is a trespasser as against the government, yet his occupancy has been tolerated and even encouraged by congress. *Earle v. Hale, supra.*

The supreme court of the United States held, in the case of *Lamb v. Davenport, 18 Wall., 307*, that "though these rights and claims rested on no statute, or any positive promise, the general recognition of them, in the end, by the government and its disposition to protect the meritorious actual settlers, who were the pioneers of emigration in the new territories, gave a decided and well-understood value to these claims. They were the subject of bargain and sale; and, as among the parties to such contracts, they were valid." And further, with regard to these possessory rights, the court says: "Parties in possession of the soil might make valid contracts, even concerning the title, predicated upon the hypothesis that they might thereafter lawfully acquire the title, except in cases where congress had imposed restrictions on such contracts."

*A fortiori,* parties holding improvements which may be removed, may make valid contracts regarding them, independently of title to the land.

35

Mantooth vs. Burke.

The agreement amongst Pendergrass, Vick and defendant, to the effect that the last might remove his rails from the southeast quarter if they should be found upon it, was valid. The consideration for it was a like privilege accorded to Vick with regard to his fencing which might be found upon the southwest quarter, when defendant might acquire it. Neither derived this privilege from Pendergrass, the common vendor, but each from the other. The effect of it was to take from the rails on the overlapping improvements the character of fixtures, and to make them the personal property of the respective owners. It had the further effect to render the possession of the overlapping improvements and land inclosed lawful, as against all persons purchasing the land with notice of the circumstances. There could be no technical trespass in removing the rails back to the true lines, nor injury to the adjoining owner for which he could claim damages.

The instructions given for the defendant were based upon this view of the law, and, taken with the evidence, were not erroneous. It would not be useful to state them at length.

Those refused upon the part of plaintiff were grounded upon the idea that the rails were fixtures, passing with the soil to the plaintiff on his purchase from the railroad, and could not be removed without his consent, irrespective of any agreement with third persons; nor could they be removed after the revocation of a license formerly granted. These instructions were properly refused.

2. LICENSE: When irrevocable The authorities are conflicting as to the right of one to *enter* upon the lands of another to take personal property of which he is the owner. The law upon that point was more rigid in England than it has been maintained in the

United States, where so much land is open, and in a state of nature. It is not necessary in this case to discuss the point. A license coupled with an interest and given for a consideration can not be revoked. If the jury believed Franklin, the plaintiff could never have got the improvements without consenting that defendant should retain property in the rails, and remove them to his own lines.

But no license in this case was ever necessary to avoid a trespass. The defendant was lawfully in the possession of the field, the wheat, and the rails around the inclosure, which possession continued until they were removed. If plaintiff had any property in the rails or the wheat, his action was not on account of any trespass, but for conversion or for consequential damages to the wheat. But the proof showed that he had no interest in either. That is, if the jury, as they well might, considered that plaintiff had bought with notice of defendant's claim to the possession and the rails, until the line could be run and assented thereto. If satisfied upon that point, there was no proof upon which they could have rendered any other verdict than they did.

This view of the case is not affected by the fact that be- 3. ESTOPPEL fore plaintiff's agreement with Franklin the title to the southeast quarter had become vested in the Little Rock and Fort Smith railroad, and was afterwards sold by that company to plaintiff. It still remains true that the plaintiff, by that agreement, got possession of the improvements, and that both Franklin and defendant rested upon that agreement, and acquiesced in any steps he might take to perfect his title. But for that Franklin might have purchased for himself, making use of his possession for the purpose, and thus protected defendant.

Plaintiff, after having obtained possession by recognizing defendant's claim, can not be heard to repudiate it.

The court did not err in refusing a new trial.

Affirm.