UNITED STATES, RESPONDENT, *v.* TITHING YARD AND OFFICES AND JAMES P. FREEZE AND ANOTHER, INTERVENORS, APPELLANTS.

VESTED RIGHT.—OCCUPANCY OF PUBLIC LAND.—An occupant upon public lands of the United States before such lands have been surveyed or thrown open to settlement, but who has placed buildings and valuable improvements thereon, has a "vested right" in such real estate.

ID.— MORMON CHURCH.— ANTI-POLYGAMY LAW.— The Mormon Church, by taking possession of certain real estate in 1848, by its agents, and by holding it first as an unincorporated association and then after 1855, as an incorporated association until 1862, and by placing thereon buildings and valuable improvements, had acquired a vested right in such real estate, which was protected by the proviso to the clause of the section of the anti-polygamy law of 1862, escheating real estate owned by religious corporations in excess of $50,000, providing "that existing vested rights in real estate shall not be impaired by the provisions of this section."

STATUTE OF LIMITATIONS.— FORFEITURE OF RES.— CONTINUOUS OFFENSE.—Under section 3, Act of Congress, July 1, 1862, which. provides that all real estate acquired or held, by any corpora-

18

tion for religious purposes, of greater value than $50,000, shall be forfeited and escheated to the United States not only an acquiring, but any holding of real estate contrary to this act within five years before suit brought, gives a right of action for the escheat.

STATUTORY CONSTRUCTION.—LIMITATION.—FUTURE LAWS.—*Semble* that section 1047, Rev. Stat. U. S., applied not only to laws which were in existence at the time the act was passed, but was intended to apply to all acts providing for penalties or forfeitures passed in the future.

APPEAL from a judgment of the district court of the third district, Hon. Charles S. Zane, judge. The opinion states the facts except the following:

The findings of the court were to the effect (1) that the Church of Jesus Christ of Latter-Day Saints was from 1855 until March 3, 1887, a corporation, and on the last date dissolved; that said church having first taken possession of certain real estate called the "Temple Block" in 1848, was in possession of the same from that time until March 3, 1887, and acquired title to the same under the townsite law passed March 2, 1867, and continued to own and hold the same until the time of filing findings, which real estate was in 1867, and has always continued to be and is now, in value largely in excess of $50,000, which premises were used for the purpose of the worship of God and are still so held by trustees for said church. The remainder of the findings are in the opinion, except that the court found that no part of the land sought to be escheated in this action was used for the worship of God or for parsonages or burial ground.

*Mr. Franklin S. Richards, Mr. Le Grande Young,* and *Mr. William H. Dickson,* for the appellants.

*Mr. John W. Judd* and *Messrs. Bennett, Marshall and Bradley,* for the respondent.

An occupancy of unsurveyed government land is not a vested right, but simply a license. *Buxton* v. *Traver*, 130 U. S. 232; *Mormon Church* v. *U. S.*, 136 U. S. 47; *Yosemite Valley Case*, 15 Wall. 77; *Frisbie* v. *Whitney*, 9 Wall. 193. This question here involved has been conclusively determined in the supreme court of the United States in *Mormon Church* v. *U. S.*, *infra*, where the same question was presented and passed upon.

SMITH, J.:

This is an action begun by the United States against certain real estate belonging to the late corporation of the Church of Jesus Christ of Latter-day Saints, to forfeit and escheat the property. The property involved in this particular action is part of lots 3, 4, 5, and 6, block 88, plat A, Salt Lake City survey, commonly known as, and called, the "Tithing Yard and Offices." The defendants William B. Preston, Robert T. Burton, and John R. Winder are alleged to be claimants, as trustees of the property for the voluntary religious association known as the Church of Jesus Christ of Latter-Day Saints. James P. Freeze and Spencer Clawson intervened in behalf of themselves and all other members of the religious association known as the Church of Jesus Christ of Latter-Day Saints, claiming that the property belonged to that religious body. The defendants Preston, Burton, and Winder answered the complaint. Freeze and Clawson, by their petition in intervention, set up substantially the same facts as alleged in the answer of the trustees. The case was tried by the court without a jury. Findings of fact and conclusions of law were made, and judgment entered in favor of the United States, escheating and forfeiting the property. The defendants and interveners appeal. Two assignments of error are made, which we deem it necessary to consider upon this appeal: First, that the court erred in deciding

that the property was subject to forfeiture and escheat, for the reason that upon the facts found it appeared the Church of Jesus Christ of Latter-Day Saints had a vested interest in said property on or before July 1, 1862; second, the court erred in deciding that the property was subject to forfeiture or escheat, for the reason that, upon the facts found, all proceedings to forfeit or escheat the property were barred by section 1047 of the Revised Statutes of the United States. This section of the Revised Statutes was pleaded both by the defendants and the interveners in bar of the action. We will consider these objections in the inverse order in which they are stated.

Section 1047, relied upon, is as follows: "No suit or prosecution for any penalty or forfeiture pecuniary or otherwise accruing under the laws of the United States, shall be maintained except in cases where it is otherwise specially provided, unless the same is commenced within five years from the time when the penalty or forfeiture accrued." The forfeiture claimed in this case arises under section 3 of the act of July 1, 1862, which is as follows: "That it shall not be lawful for any corporation or association for religious or charitable purposes to acquire or hold real estate in any territory of the United States during the existence of the territorial government, of a greater value than $50,000.00, and all real estate acquired or held by any such corporation or association contrary to the provisions of this act shall be forfeited and escheated to the United States, provided that the existing vested rights in real estate shall not be impaired by the provisions of this section." The title to the land in controversy was acquired by the mayor of Salt Lake City in November, 1871. In 1872 it was conveyed to the trustees of the corporation of the Church of Jesus Christ of Latter-Day Saints for the use and benefit of said church. Title remained in said trustees until the 3d of March, 1887. It

is claimed by the appellants that, more than five years having elapsed since the perfect title to the property was acquired by the church, no action can now be prosecuted by the United States to forfeit or escheat the property. We have been cited to no case upon this question exactly like the one at bar. Several cases have been cited in which it is held that section 1047 applied to debts and civil actions and forfeitures, as well as to criminal ones. It was so held in the case of *Adams* v. *Woods*, 2 Cranch, 336, which was a suit to enforce a penalty founded on the act of the 22d of· March, 1794 (1 Stat. 347), prohibiting the slave trade. It was held that the action was barred, not having been begun within the period prescribed by the statute. Marshall, C. J., discussing the question, says:

"It is pretended that the prosecutions limited by this law are those, only, which are carried on in the form of an indictment or information, and not those where the penalty is demanded by an action of debt. But if the words of the act be examined they will be found to apply, not only to any particular mode of proceeding, but generally to any prosecution, trial, or punishment for the offense."

And the court held that the action of debt for the penalty was a prosecution and was barred by the statute of limitation. We think section 1047 includes civil as well as criminal proceedings. But the difficulty in the case at bar is that the language of section 3 of the act of July 1, 1862, is that all real estate acquired or held by any such corporation or association shall be forfeited, etc. Counsel for appellant do not deny that the property in question was held in violation of this statute within five years preceding the commencement of this suit. The cases most nearly in point, it seems to us, are those arising under the internal revenue laws, where proceedings *in rem* for forfeiting real estate are repeatedly provided for. For

instance, land becomes forfeited for being used for the purposes of distillery, where the required bond has not been given. Sections 3281, 3260, Rev. St. U. S. Under such statutes it has been frequently held that the property is subject to forfeiture on account of continued use of it, notwithstanding the use may have begun more than five years before the commencement of the action. In contemplation of law, the land itself is guilty, and it is the guilt of the land that makes it forfeitable by reason of its being employed in an unlawful use. Wap. Proc. in Rem. § 178, says: "Lands are forfeited for use in contravention of law. The violation of law by the use of the land is in some instances by the owner, but not necessarily so. It is not the owner's guilt, but the land's guilt, by its use, that renders it forfeit. There is an offending person and an offending thing, but the proceedings are against the latter." At section 182, the same author, analyzing section 3 of the act of July 1, 1862, above cited, says: "The thing to be seized and condemned is territorial real estate worth more than $50,000. The offense of the thing is being acquired or held by the religious or charitable association to the amount forbidden. The *jus in re* arises from the contravention of law." We believe this to be a proper construction of the statute before us,—that the property acquired or held in violation of the law within five years before the commencement of the action is subject to forfeiture.

The remaining question which we deem it necessary to consider is whether or not the property involved in this action comes within the proviso found in section 3 of the act of July 1, 1862. That proviso is as follows: "That existing vested rights in real estate shall not be impaired by the provisions of this section." The findings of fact in this case show that the land in controversy in this action was first laid out in 1848; then taken possession of by the

representatives of the church known as the Church of Jesus
Christ of Latter-Day Saints. This church was a voluntary
sect until January 19, 1855, when it was incorporated, and
that the corporation subsequently possessed it, up to and
including July 1, 1862. That buildings and other improve-
ments of considerable value were built thereon by the
church, and that the church was in actual possession and
use of the property, and the improvements thereon, until
the 1st day of July, 1862. That in November, 1871, the
land was entered under the town-site act by the mayor of
Salt Lake City. That Brigham Young, who was then
president of the church, claimed the land under the town-
site law, and it was conveyed to him by the mayor of said
city, as trustee for the church aforesaid. That it after-
wards passed by *mesne* conveyance to Robert T. Burton,
who held the title on the 3d day of March, 1887, as trustee
for the church. The question arises whether or not this
parcel of land is forfeitable to the government of the United
States under section 3 of the act of congress of July 1,
1862, which we have already quoted at length in this opin-
ion. It is claimed by counsel for the government that
inasmuch as the town-site law had not been extended over
the Territory of Utah at the time of the passage of this
act, nor had the public surveys been extended over the
lands in controversy, the church had not, nor was it possi-
ble for it to have, acquired any vested interest in the lands
in controversy at or prior to the time this act took effect;
that it had no interest which the government was bound
to respect.

We do not deem it necessary to decide whether or not
congress had authority, under the constitution, to ignore a
right such as the church had in these lands in July, 1862.
The real question is whether or not this act manifests an
intention on the part of congress to preserve or ignore that
right, such as it was. We seriously doubt whether con-

·gress has that unlimited control over the property rights ·of persons upon the public domain which counsel for the government insist upon. The city of Salt Lake was founded in 1847. In 1850 the territorial government was ·organized. Congress passed the organic act, and thereby ·extended an invitation to the citizens of the government to establish their homes in the territory. Under this invi-·tation, citizens took up their abode here in great numbers prior to the passage of the act of 1862. It was, of course, undisputably necessary that these settlers should found ·cities and villages at once, and enter into possession of portions of the public domain, cultivate, build upon, and ·otherwise improve the same, notwithstanding that neither the town-site law nor the public surveys had been extended ·over the Territory. In 1862 Salt Lake City was a town of ·several thousand families, and large sums had already been ·expended in buildings and other improvements by the inhabitants within the corporate limits of the city. Now ·it is claimed that congress had the power in 1862 to have ·withdrawn all lands within the city for sale, and to have ·driven the inhabitants of the city therefrom. We think it may well be questioned whether such action on the part of the government would not be a violation of that provision of the constitution which ordains that no one shall be deprived of his life, liberty, or property save by due pro-cess of law, but it is not necessary for us to decide this question. In our view of this case, if it be conceded that ·congress has the authority, under the constitution, to :perpetrate such an act of cruelty and oppression towards :its citizens as that above indicated, it is certainly not to ·be lightly presumed that the government contemplated any . such wrong or injustice.

This brings us to the question of what is the meaning . of the proviso " that existing vested rights in real estate : shall not be impaired by the provisions of this section."

In Cooley's Constitutional Limitations (page 438), the author says: "But, as a shield of protection, the term 'vested rights' is not used in any narrow or technical sense, or as importing legal power or control, merely, but rather as impairing a vested interest, which it is right and equitable that the government should recognize and protect, and of which the individual cannot be deprived arbitrarily without injustice." It is clear, by the decisions of the supreme court of the United States, that the church had, at the time of the passage of the act of 1862, an interest, in the lands in controversy in this action which the law recognizes, and such as the courts of the government would enforce and protect. It had a right of possession. which the court would have enforced against any one who disturbed it in its possession. It had an interest such as it could incumber by way of mortgage, and the federal courts would have enforced the mortgage. It had an interest such as it could contract to sell and convey, and specific performance of such contract would have been enforced by the courts. See *Stringfellow* v. *Cain*, 99 U. S. 610; *Hussey* v. *Smith*, 99 U. S. 20; *Lamb* v. *Davenport*, 18 Wall. 307. An examination of these cases will show that according to the rule established in the supreme court of the United States, if in 1861 the church had entered into a contract with one then an occupant of the Tithing House property for the purchase thereof, upon a proper tender being made, the vendor had refused to convey, the courts of the United States would have compelled a conveyance, or, had the church refused to accept a conveyance, and make payment according to contract, the vendor could have had a decree enforcing payment. Suppose the church had acquired the interest which it had in the Tithing House property at the time of the passage of the act of 1862 in the manner just suggested. It is clear that it would have had no better or greater interest or right than it in fact

had at that time; and yet, if the contention of counsel for the government is correct, the same court which rendered the decree enforcing such contract against the church would be cómpelled also to hold that the church had no estate or interest in the property, vested or otherwise.

In the case of *Lamb* v. *Davenport*, 18 Wall. 307, the defendant, Davenport, had acquired possession by purchase of certain lots upon public lands of the United States in the city of Portland, Or. After the title had been perfected the owner of the title undertook to recover the property. Davenport defended upon the ground that he was the equitable owner. Mr. Justice Miller, in delivering the opinion of the court, says: "The equity which Davenport sets up in his cross bill arises from transactions antecedent to the issue of the patent certificate of Lownsdale, and, indeed, antecedent to the enactment of the donation law of congress, under which Lownsdale's title originated. It is not necessary to recite in this opinion all of those transactions. It is sufficient here to say that, several years before any act of congress existed by which title to the land could be acquired, settlement on and cultivation of a large tract of lands, which includes the lots in controversy, had been made, and a town laid off into lots, and lots sold, and that these are a part of the present city of Portland. Of course, no legal title vested in any one by these proceedings, for that remained in the United States, all of which was well known and undisputed; but it was equally well known that these possessory rights and improvements placed on the soil were, by the policy of the government, generally protected, so far at least as to give priority of the right to purchase whenever the land was offered for sale, and where no special reason existed to the contrary. And though these rights or claims rested on no statute, or any positive promise, the general recognition of them, in the end, by the govern-

ment, and its disposition to protect the meritorious actual settlers who were the pioneers of immigration in the new territories, gave a decided and well-understood value to these claims."

And so we find here. The possessory rights of the several occupants, including the church, of lots in the city of Salt Lake, together with the improvements thereon at the time of the passage of the act of 1862, had a well-understood value; and it was this valuable estate or interest which congress intended to preserve unimpaired by the proviso of section 3 of the act of July 1. It is evident that it was not the intention of the government, by its legislation, to disturb, or in any manner interfere with, any interest, whatever the nature thereof might be, which had been acquired prior to the passage of the act. The act looked to the future only. This much is apparent from the face of it. If we look to the debates in congress upon the passage of the law, we find that such was, unquestionably, the general purpose of the framers of this act. Section 3 of the act was an amendment reported by the judiciary committee of the senate to the house bill. In the Congressional Globe of 1862 (page 2506), will be found the statement of Senator Bayard of that committee. In reporting this section, without quoting his language, it is sufficient to say that he declares clearly the purpose of congress is to prevent the church from acquiring any other or further property than that it then possessed, except it be within the limitation of the section. We are aware of the fact that the arguments of legislators in debate on the passage of a law cannot be resorted to for the purpose of giving a meaning to the terms found in the statute, but they may be resorted to in ascertaining the general object of the legislative enactment. See opinion of Justice Field in *Ah Kow* v. *Nunan*, 5 Sawy. 560.

Aga n, this is a penal statute, and, according to a funda-

mental rule of interpretation, it is to be strictly construed against the government, and it is to be liberally construed in favor of the person or corporation sought to be charged with its penalties. As was said in *Chase* v. *Railroad Co.,* 26 N. Y. 525: "In statutes giving a penalty, if there be reasonable doubt of the case made upon the trial or in the pleadings coming within the statutes, the party of whom the penalty is claimed is to have the benefit of such doubt." Now, if this proviso is not intended to preserve and protect just such a right as the church had in this parcel of land, it is entirely clear that there is nothing which it could preserve or protect, and this must have been known to congress. While the language of the section is general, it is a matter of common knowledge that it was aimed at the Mormon Church in Utah. As was said by Mr. Justice Field in the case just cited in 5 Sawy., "the class character of this legislation is none the less manifest because of the general terms in which it is expressed. We cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seat upon the bench, we are not struck with blindness, and forbidden to know as judges what we see as men; and when an ordinance so general in its terms only operates upon a special race, sect, or class, it being universally understood that it is to be enforced against that race, sect, or class, we may justly conclude that it was the intention of the body adopting it that it should have such operation, and treat it accordingly." There was no United States land office established in Utah until long after 1862. Congress is presumed to have known that the legal title to no single foot of land in the Territory had passed from the government, to any individual or corporation, at the time this law took effect. As we have shown, it was intended to affect only the rights and interests of the Mormon Church in Utah. It cannot be seriously claimed that the purpose

of congress in the proviso of section 3, under the circumstances, was to preserve and protect only some legal, vested estate or interest in lands, for the reason that it was impossible to do this. The church against which the legislation was directed could not have, prior to that time, acquired any such interest. We are of opinion that this property involved in this action was not subject to forfeiture or escheat, under the provisions of the act of 1862, and that the judgment of the court below should be reversed, and the case remanded, with directions to dismiss the action, and it is so ordered.

MINER, J., and BARTCH, J., concurred.