## LEWIS *et al.* v. SITTLE.

No. 1385.    Opinion Filed December 12, 1911.

**COURTS — Jurisdiction — Ind. Ter. Courts.** The United States courts of the Indian Territory had jurisdiction of actions to determine the right of possession of town lots in the Choctaw Nation, prior to the passage of the Curtis act and the Atoka Agreement therein contained (Act of June 28, 1898, 30 Stat. at L. 495), and the passage of that act did not divest the courts of jurisdiction over an action then pending.

(Syllabus by Ames, C.)

*Error from District Court, Pittsburg County; Preslie B. Cole, Judge.*

Action by Yancey Lewis, Allen Wright and O. W. Argo, plaintiffs in error, plaintiffs below, against Ed. D. Sittle, defendant in error, defendant below, to enjoin the defendant from seeking to enforce a judgment rendered by the United States Court for the Central District of the Indian Territory prior to statehood, under which the defendant recovered a lot from the plaintiffs, situated in South McAlester. · Judgment for defendant, and plaintiffs bring error. Affirmed.

*Yancey Lewis* and *Horton & Smith,* for plaintiffs in error.

*S. A. Wilkinson,* for defendant in error.

Opinion by AMES, C. On April 22, 1898, the defendant filed suit in the United States Court for the Central District of the Indian Territory at McAlester, against the plaintiffs, to recover a lot and the improvements thereon in the city of South McAlester, and damages for the unlawful detention thereof. On

June 28, 1898, while the said proceeding was pending, an act of Congress, commonly known as the Curtis act (30 St. at.L. 495), became a law. The suit proceeded in the courts to final judgment in favor of the defendant Sittle. It is unnecessary to recite the history of that litigation, further than to say that appeals were taken to the Indian Territory Court of Appeals and to the Circuit Court of Appeals for the Eighth Circuit, and that the judgment of the trial court became final.

This suit was brought by the plaintiffs to enjoin the defendant from enforcing that judgment, on the ground that the Curtis act divested the United States Court for the Indian Territory of all jurisdiction to proceed further, and that the judgment sought to be enjoined is therefore void.

It is conceded that that court had jurisdiction prior to the passage of the Curtis act. From the organization of the courts of the Indian Territory, possessory rights in the towns were protected by those courts, and a clear statement of the situation then prevailing is given by Judge Rosser, in *Johnson et al. v. Riddle,* decided in November 11, 1911. (Rehearing pending.)

"The law under which title to town lots in the Chickasaw and Choctaw Nations was obtained, is contained in the provisions of the Atoka Agreement set out in full in the statement of this case. It is contended by plaintiff that this statute gave the right of purchase to any one owning improvements on the lot, and it is contended that it makes no difference whether the person owning the improvements has the right to the possession of the lot or not; or probably better stated, his contention is that the passage of the Curtis bill and ratification of the Atoka Agreement definitely conferred and fixed the right to purchase upon the person who owned the improvements at the time the lots were scheduled, and that no previous contract or dealing with the lot was relevant upon the question of the right of purchase. To this view assent cannot be given. By this legislation Congress and the tribes meant to give the right to purchase to those who rightfully had improvements on the lot. It cannot be presumed that Congress meant to give the right of purchase to persons who wrongfully had them there. Rights in the lots, regardless of whether or not they had substantial and valuable improvements, were always recognized and sustained by the courts of the Indian Territory. The case of *Walker Trading Co. v. Grady Trading Co.,* 39 S. W. 354, de-

cided by the Indian Territory Court of Appeals in January, 1897, decided that a corporation could collect rent from a tenant upon its improvements, though it did not own the land, and though the law of the Choctaw Nation passed in 1887 required all persons, not Indians, owning rent houses to dispose of them in sixty days under penalty of having them seized and sold. At the same time it was decided in *Kelley v. Johnson,* 39 S. W. 352, that a citizen of the United States who was in possession of a lot in a town in the Choctaw Nation, around most of which he had a fence, could recover the possession of the lot in a forcible entry suit from a member of that nation, who broke down the fence and took possession. In the case of *Tye v. Chickasha Town. Co.,* 48 S. W. 1021, in which the plaintiff in this case represented the prevailing party, decided in January, 1899, it was held that a transfer of a vacant, unimproved lot by the corporation to a person not an Indian, was a sufficient consideration for a note given for the purchase price.

"In addition to these cases, the case of *Williams v. Works,* 76 S. W. 246; *Fraer v. Washington,* 60 C. C. A. 194; and the unlawful detainer branch of this case, *Ellis v. Fitzpatrick,* 64 S. W. 567, 55 C. C. A. 260, as well as numerous decisions by the *nisi prius* courts established the rule that contracts with reference to lots, the title to which was in the tribes, were valid, and the possession of such lots must be respected. It would have been impossible to build towns in the Indian Territory had the rule been otherwise. Considerable towns were built up, and considerable money invested upon the faith of mere possessory rights, such as Fitzpatrick appears to have had in this case, and those rights were always respected by the law-abiding elements of the community. If the unimproved lots had been considered open to any taker, the lot-jumper, and people willing to maintain possession by force, would have been the only ones that would have gone into towns, and towns are not built by that kind of people. Very few men will build in a place where the prospective builder must sleep on his lot and on his arms until he can place substantial improvements on the property. Then the disposition of most men in those times was to want someone between them and the tribes in the chain of title. The custom was for some person to get peaceable possession of the town site and sell and rent the land just as if he owned it. While he was not usually a very popular person in the community, still the rights which had their inception in him were the foundation upon which the town rested. In fact the procedure in building the towns was exactly the same that prevailed in other parts of the United States, where the set-

tlement of the country preceded the formal opening by the government.

"The case of *Lamb v. Davenport*, 18 Wall. 307, involved the validity of contracts made by Lamb and business associates for the conveyance of lots in what was afterwards the city of Portland, Ore., and the right of purchasers from Lamb and his associates to compel the heirs of Lamb to convey the title to the lots so sold to them, Lamb having died before he received title from the government. In deciding that the purchasers could require the heirs of Lamb to make the conveyance, Mr. Justice Miller, who delivered the opinion of the court, said:

"'It is not necessary to recite in this opinion all of those transactions. It is sufficient here to say that several years before the act was passed, and before any act of Congress existed, by which title to the land could be acquired, settlement on and cultivation of a large tract of land, which includes the lots in controversy, had been made, and a town laid off into lots, and lots sold, and that these are a part of the present city of Portland. Of course, no legal title vested in any one by these proceedings, for that remained in the United States—all of which was well known and undisputed. But it was equally well known that these possessory rights and improvements placed on the soil, were by the policy of the government generally protected, so far, at least, as to give priority of the right to purchase whenever the land was offered for sale, and where no special reason existed to the contrary. And though these rights or claims rested on no statute, or any positive promise, the general recognition of them in the end by the government, and its disposition to protect the meritorious, actual settlers, who were the pioneers of emigration in the new territories, gave a decided and well-understood value to those claims. They were the subjects of bargain and sale, and, as among the parties to such contracts, they were valid. The right of the United States to dispose of her own property is undisputed, and to make rules by which the lands of the government may be sold or given away is acknowledged; but, subject to these well-known principles, parties in possession of the soil might make valid contracts, even concerning the title, predicated upon the hypothesis that they might thereafter lawfully acquire the title, except in cases where Congress had imposed restrictions on such contracts.'"

In that case, while the question of the court's jurisdiction is not discussed, it was necessarily involved, and the court held that possession retained of a town lot in the Chickasaw Nation,

pending an appeal, by the party in possession, from a judgment adverse to him of the trial court, was not sufficient upon which to base the right to acquire the lot under the Curtis act. No specific provision of the Curtis act is called to our attention as divesting the courts of jurisdiction of the matters then pending, nor do we find any such provision in the act. On the contrary, the Atoka Agreement does provide:

"It is further agreed that the United States courts now existing, or that may hereafter be created, in the Indian Territory, shall have exclusive jurisdiction of all controversies growing out of the titles, ownership, occupation, possession, or use of real estate, coal, and asphalt in the territory occupied by the Choctaw and Chickasaw tribes."

Sections 2, 3, 5, 6, 7, 8, 10, and 14 [Curtis act], all relate to, or confer upon the United States courts of the territory, jurisdiction relative to matters therein mentioned, and while these sections do not apply to the particular subject-matter of this controversy, they lend weight to the conclusion that it was not the purpose of Congress to divest the courts of jurisdiction already existing. Sections 14 and 15 of the act provide for the incorporation of towns, and in doing so expressly recognize the right of the owner of the improvements upon any town lot to purchase the same at fifty per cent. of the appraised value.

Under this act, it is matter of common history that the town-site commission did entertain contests, and the courts likewise tried the rights of parties to the improvements and possession of town lots. It is also true that town-site commissions made a practice of suspending proceedings in cases where the courts were entertaining jurisdiction of cases affecting the right to the possession of such lots, or the ownership of improvements, and so far as we know, this is the first time that the jurdisdiction of the courts has been called in question.

We do not think the effect of the Curtis act was to deprive the courts of jurdsdiction.

It is next urged that the act of March 3, 1905 (33 U. S. St. at T. 1060), had the necessary effect of repealing any jurisdiction in the courts of the Indian Territory over the subject-matter

of this suit, and the following provision of that act is relied upon:

"That the several town-site commissions in the Choctaw, Creek, and Cherokee Nations shall, upon the completion of the appraisement of the general lots in their respective nations, be abolished by the Secretary of the Interior at such time as in his judgment it is considered proper; and all unfinished work of such commissions, the sale of town sites at public auctions, disposition of contests, the determination of the rights of claimants, and the closing up of all other minor matters pertaining thereto shall be performed by the Secretary of the Interior under such rules and regulations as he may prescribe; provided further, that all unsold lots, the disposition of which is required by public auction, shall be offered for sale, and disposed of from time to time by the Secretary of the Interior for the best obtainable price as will, in his judgment, best subserve the interest of the several tribes; and the various provisions of the law in conflict herewith are modified accordingly."

We do not think this position is well taken. The purpose of this act was to preserve in the Department of the Interior all unfinished business pending before the various town-site commissions when they were abolished, and not to grant unto them any new jurisdiction, or to take from the courts jurisdiction which they were rightfully exercising.

We do not deem it necessary to state in detail the history of this litigation, or to protract this opinion by an examination of authorities construing other statutes, but content ourselves with expressing the opinion that the judgment of the court was not void, and, therefore, that the plaintiffs in error were not entitled to an injunction restraining its enforcement, and that the decision of the trial court should be affirmed.

By the Court: It is so ordered.

All the Justices concur.